UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| MILTON WILSON KAISER JR., individually and as independent administrator of and on behalf of the ESTATE OF MILTON WILSON KAISER, III and MILTON WILSON KAISER III's heir(s)-at-law and wrongful death beneficiaries; and CATHERINE MCGEHEE, individually, | § § § § § § § § § | CIVIL ACTION NO.<br><br>JURY DEMANDED |
| Plaintiffs, | § § | |
| v. | § § | |
| DEWITT COUNTY, TEXAS; SOUTHERN HEALTH PARTNERS, INC. A/K/A SHP; and DEWITT MEDICAL DISTRICT D/B/A CUERO REGIONAL HOSPITAL, | § § | |
| Defendants. | | |

## PLAINTIFFS' ORIGINAL COMPLAINT

> **34-year-old pretrial detainee Milton Wilson Kaiser, III suffered and died a preventable death from incarceration in the DeWitt County jail due to Defendants' policies, practices, and/or customs.**



Table of Contents

I.    Introductory Allegations..................................................................................3
    A.    Parties...................................................................................................3
    B.    Jurisdiction and Venue........................................................................5

II.    Factual Allegations...........................................................................................6
    A.    Preliminary Statements.......................................................................6
    B.    Trey's Suffering and Death in the DeWitt County Jail.......................7
        1.    Introduction.............................................................................7
        2.    General Allegations.................................................................8
        3.    Custodial Death Report..........................................................21
        4.    Video Recordings Summary...................................................21
        5.    Autopsy Report.......................................................................29
        6.    Texas Commission on Jail Standards......................................30
    C.    Liability of DeWitt County and SHP..................................................37
        1.    Introduction.............................................................................37
        2.    SHP's Agreement with DeWitt County...................................38
        3.    Nondelegable Duties and Respondeat Superior......................55
        4.    Defendants' Policies, Practices, and Customs........................57

III.    Causes of Action.............................................................................................61
    A.    Remedies for Violation of Constitutional Rights................................61
    B.    Cause of Action Against DeWitt County and SHP Under 42 U.S.C. § 1983 for
          Violation of Constitutional Rights......................................................62
    C.    Cause of Action Against DeWitt Medical District Pursuant to EMTALA.............65
    D.    DeWitt Medical District Receives no Eleventh Amendment Protection................67

IV.    Concluding Allegations and Prayer..................................................................71
    A.    Conditions Precedent...........................................................................71
    B.    Use of Documents at Trial or Pretrial Proceedings.............................71
    C.    Jury Demand........................................................................................72
    D.    Prayer...................................................................................................72

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs file this complaint and for cause of action will show the following.

I.      Introductory Allegations

A.      Parties

1.      Plaintiff Milton Wilson Kaiser, Jr. sues in his individual capacity and as the independent administrator of the Estate of Milton Wilson Kaiser III, Deceased. Milton Wilson Kaiser, III is referred to herein at times as "Trey" or "the decedent" depending on the context. Milton Wilson Kaiser, Jr. asserts claims in the capacity of independent administrator on behalf of all wrongful death beneficiaries (including himself [the decedent's father] and Catherine McGehee [the decedent's mother]) (collectively "Wrongful Death Beneficiaries"). Milton Wilson Kaiser, Jr. asserts claims on behalf of and seeks all wrongful death and other damages available under law to the Wrongful Death Beneficiaries. Milton Wilson Kaiser, Jr. also asserts claims on behalf of the estate and all of the decedent's heirs (currently Milton Wilson Kaiser, Jr. and Catherine McGehee) (collectively "Claimant Heirs"). Milton Wilson Kaiser, Jr. asserts claims on behalf of and seeks all survival and other damages available under law to the Claimant Heirs. Milton Wilson Kaiser, Jr. qualified as independent administrator in Cause Number PR2025-12605, in the County Court of DeWitt County, Texas, in a case styled *Estate of Milton Wilson Kaiser, III, Deceased.*

2.      Plaintiff Catherine McGehee is a natural person who sues in her individual capacity and seeks all damages and remedies available to her as a wrongful death beneficiary and/or heir.

3.      Defendant DeWitt County, Texas ("DeWitt County" or "the County") is a Texas county. DeWitt County may be served with process pursuant to Federal Rule Procedure

4(j)(2) by serving its chief executive officer, Honorable County Judge Daryl L. Fowler, at 307 North Gonzales Street, Cuero, Texas 77954, or wherever Honorable County Judge Daryl L. Fowler may be found. Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a). The County acted or failed to act at all relevant times through Southern Health Partners, Inc. d/b/a SHP and County employees, agents, representatives, deputies, and/or chief policymakers, all of whom acted under color of state law at all relevant times, and is liable for such actions and/or failures to act to the extent allowed by law (including but not necessarily limited to law applicable to constitutional violation claims pursuant to 42 U.S.C. § 1983). The County's and/or Southern Health Partners Inc. d/b/a SHP's policies, practices, and/or customs were moving forces behind, caused, were proximate causes of, and were producing causes of constitutional violations and damages (including death) referenced in this pleading.

4.      Defendant Southern Health Partners, Inc. a/k/a SHP ("SHP") is a Delaware corporation. SHP may be served with process by serving its registered agent for service of process, Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, at its registered office, 211 E. 7th Street, Suite 620, Austin, Texas 78701. SHP acted and/or failed to act at all relevant times through its employees, agents, representatives, and/or chief policymakers and is liable for such actions and/or failures to act to the extent allowed by law (including but not necessarily limited to vicarious liability law and law applicable to claims pursuant to 42 U.S.C. § 1983). SHP acted at all times under color of state law, and its policies, practices, and/or customs were moving forces behind and caused constitutional violations and resulting damages (including death) referenced in this pleading.

5.      Defendant DeWitt Medical District d/b/a Cuero Regional Hospital ("DeWitt Medical District") is a hospital district created under Texas law. DeWitt Medical District has failed to designate a registered agent for service of process. Therefore, pursuant to Texas law and federal law which allows application of Texas law in such an instance, the Texas Secretary of State shall be the agent for service of process for DeWitt Medical District. Therefore, DeWitt Medical District may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701. The Texas Secretary of State shall then forward a copy of this complaint, and a summons directed to DeWitt Medical District d/b/a Cuero Regional Hospital, Chief Executive Officer Lynn Falcone, 2550 North Esplanade Street, Cuero, Texas 77954. DeWitt Medical District acted or failed to act at all relevant times through its and/or Cuero Regional Hospital employees, agents, apparent or ostensible agents, borrowed servants, representatives, physicians, nurses, and other licensed and possibly non-licensed personnel and is liable for such actions and or failure to act to the extent allowed by law (as more specifically referenced elsewhere in this pleading).

B.      Jurisdiction and Venue

6.      The Court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. §§ 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statute(s) providing for the protection of civil rights. This suit arises under at least the United States Constitution and 42 U.S.C. § 1983. The court has personal jurisdiction over the County and DeWitt Medical District because they are located in Texas. The Court has personal jurisdiction over SHP because SHP's minimum contacts with Texas are such that SHP would expect to be subject to the Court's jurisdiction. Venue is proper in the Victoria Division of the United States District Court for the Southern District of

Texas, pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in Dewitt County, which is in the Victoria Division of the Southern District of Texas.

II.    Factual Allegations

      A.    Preliminary Statements

      7.    This is in part a constitutional rights case. As discussed in further detail below, Defendants DeWitt County and SHP had constitutional duties to provide reasonable and necessary medical care to pretrial detainees being held in or transported to the County jail, to protect such detainees, and not to punish them. Defendants violated the decedent's constitutional rights when they implemented policies, practices, and customs that withheld reasonable and necessary medical care from the decedent, failed to protect him, punished him, and were a moving force behind his suffering and death, as described below. There was no legitimate governmental objective for such policies, practices, and customs to the extent they caused or reflected unconstitutional conditions of confinement.

      8.    Plaintiffs provide in factual allegations sections below the general substance of certain factual allegations. Plaintiffs do not intend to provide in detail, or necessarily in chronological order, all factual allegations. Rather, Plaintiffs intend to provide sufficient fair notice of the general nature and substance of Plaintiffs' allegations and further demonstrate that Plaintiffs' claims have facial plausibility. Moreover, when Plaintiffs quote a document, conversation, or recording verbatim, or provide a person's name, Plaintiffs have been diligent to do so accurately and without any typographical errors. However, typographical errors may still exist. Moreover, as to names of natural people, some names may inadvertently be spelled phonetically.

9.     Plaintiffs assert conditions of confinement claims, which require no deliberate indifference on behalf of a governmental or private entity or governmental or private actor. In the alternative, Plaintiffs assert episodic acts or omissions claims. Pursuant to United States Supreme Court authority, Plaintiffs are not required to assert specific constitutional guarantees or claims but rather must merely plead facts that give rise to constitutional claims. Plaintiffs thus ask the court to apply the correct legal theories to facts pled.

10.    Plaintiffs will only be able to plead their best case after conducting discovery.  Plaintiffs do not necessarily agree to any exact times asserted in this pleading, as evidence will likely conflict regarding times of certain events. Plaintiffs provide rough estimates of likely times of certain events merely for convenience in giving some chronological perspective. Courts have recognized that it is exceedingly rare that a plaintiff will have access to or knowledge of specific details regarding the existence or absence of a defendant's internal policies or training procedures before discovery. Plaintiffs intend to amend this pleading as further facts are developed or in the event any court determines that Plaintiffs' live pleading is deficient in any manner.

B.     Trey's Suffering and Death in the DeWitt County Jail

1.     Introduction

11.    Trey needlessly suffered and died from Defendants' policies, practices, and/or customs. Trey was booked into the Dewitt County jail on April 12, 2024 at approximately 8:50 p.m. and was being held as a pre-trial detainee. There was no nurse on duty in the Dewitt County jail on weekends. Moreover, Trey was not placed on a medical detox protocol but instead simply put into a cell for "observation."  Observation without action does not preserve life.

2.     General Allegations

12.     Plaintiffs provide in this section, generally in chronological order, some material events regarding and preceding Trey's incarceration in the DeWitt County jail. DeWitt County Sheriff's Deputy Kenneth Wilson arrested Trey at a residence in Yoakum, Texas on Friday, April 12, 2024. It was his opinion that Trey was breathing heavily, and that his body was tense. Deputy Wilson said that no force was used to arrest Trey.  He took Trey to Cuero Regional Hospital supposedly for medical clearance because he believed Trey was under the influence of a narcotic. However, he would not even allow medical personnel to remove Trey from the police vehicle to perform an appropriate medical evaluation.

13.     Cuero Regional Hospital records indicate that Trey received services on April 12, 2024 for a "medical clearance." Records also list as Trey's insurance "Southern Health Partners." Even though Trey was handcuffed and shackled in the back of a police vehicle, records incorrectly indicate that he was uncooperative. Records read in part, "Police do not want to get him out of the back of the vehicle due to violent behavior." The allegation regarding Trey's violent behavior was false. Records also read in part, "Patient examined in back of police SUV due to violent outbursts with police." The allegation regarding Trey's violent outbursts with police was false.

14.     While Cuero Regional Hospital records indicate that an examination was done, no appropriate examination whatsoever was conducted. Records admitted that Trey was tachycardic. They also admit that no labs were conducted and no imaging was performed. Thus, any assertion by DeWitt County and or Cuero Regional Hospital that an appropriate examination of Trey was conducted to clear him for incarceration is false, as the examination was, from the perspective of an emergency room physician, fraudulent. Records

do admit that the hospital believed, as its primary impression, that Trey suffered from methamphetamine intoxication.

15.     There was no reason for the officer to prohibit Trey from exiting the police vehicle for an appropriate medical evaluation in the emergency department of the hospital. Trey's manner indicated significant intoxication and/or significant altered mental status at the time of his arrest. When he was handcuffed in the residence, no one needed to use any further force against him. Thus, since Trey was not violent toward any officers, there was absolutely no reason why Trey could not have been removed from the vehicle for an appropriate medical examination. Trey suffered and died in part because of the inability to obtain an appropriate medical examination.

16.     Trey was thereafter transported to the DeWitt County jail.  The booking report admitted that Trey died in custody, and that his death resulted from unnatural causes. Cory McCord was the booking officer, and Merrill Hunter was the search officer. The Screening Form for Suicide and Medical/Mental/Developmental Impairments included a handwritten note indicating that Trey was "high on meth." The "high on meth" phrase was also handwritten in response to a question, "Does inmate appear to be under the influence of alcohol or drugs?"

17.     Sergeant Cory McCord indicated that Deputy Wilson arrived at the jail with Trey at about 8:30 p.m. on April 12, 2024. Corporal Merrill went out to the sally port to bring Trey into booking. Sergeant McCord then went into the sally port and saw Trey sitting in a police vehicle. Trey indicated that the leg shackles were tight on his ankles. Corporal Merrill loosened the leg restraints, and Trey slowly got out of the vehicle. Corporal Merrill and

Deputy Wilson had to assist Trey to walk into booking. Corporal Merrill removed handcuffs so that Trey could brace himself against the wall, and Sergeant McCord asked Trey to pick up his leg so that he could take off leg restraints. Trey was not violent, and there was clearly no need to have left him shackled and handcuffed in the back of a police vehicle while medical personnel attempted to evaluate him. Lieutenant Guajardo called the jail later, at approximately midnight, and asked about Trey. Sergeant McCord told Lieutenant Guajardo said that Trey was sweating and looked as if he were coming down from drugs.

18.    Jailer Jaelyn Garza indicated that Sergeant McCord and Corporal Merrill did all booking tasks for Trey. Jailer Garza said that Trey would yell the word "really" multiple times out of nowhere. She said that Trey started to lay on a bench, and that Jailer Ian Renteria told her that Trey started to undress and tug on his body parts. Jailer Garza suggested to Sergeant McCord and Corporal Merrill in substance that, once Trey was clothed, if he did not have a general comprehension of what was going on, someone else should be told about it, or something else should be done for Trey.  She also said that they should watch how Trey fared overnight, because he was acting in a way that was more unusual than most they saw on drugs in the jail. He was undressed and laying all over the cell, walking, or sitting until shift change.  Jailer Garza was clearly concerned about Trey's condition based on her observation of him, but nobody did anything of substance to address Trey's issues.  They acted in accordance with County and SHP policy, practice, and/or custom.

19.    Jailer Renteria observed, on April 12, 2024, that Trey was yelling and screaming at the window and was acting wild. Jailer Renteria also said that another time, which was likely on April 13, 2024, Trey was rolling on the floor from side to side, moaning. Jailer Renteria said that when he arrived at the jail at 6:00 p.m., apparently on April 13, 2024,

Trey was already lying on his back in the cell and rolling around on the floor.

20.    On Saturday, April 13, 2024, at approximately 9:00 p.m., which was roughly 24 hours after Trey was booked into the jail, Jailer Renteria was conducting cell checks and checking booking. He saw that Trey was lying on his back, breathing fast, and making noises. He saw that Trey was like that for about an hour, after which Trey rolled onto his stomach. When Trey was on his stomach, Jailer Renteria saw that Trey was still breathing fast and making noises. This continued until approximately midnight.

21.    Jailer Renteria went into the cell at approximately 1:00 a.m. on Sunday, April 14, 2024 to check Trey's temperature. Trey was still breathing the same way, making noises, and mumbling. This was about 28 hours after Trey was booked into the jail.  Jailer Renteria and Jailer Garza brought to the attention of Sergeant McCord and Lieutenant Guajardo their concerns about Trey and his condition. Jailer Garza said that Trey was "detoxifying," and that they would wait it out. This comment was reflective of the jail's unconstitutional "sleep it off" policy for highly intoxicated or drug or alcohol addicted detainees.

22.    Jailer Jaelyn Garza conducted cell checks from 6:00 p.m. to 9:00 p.m. on April 13, 2024, Trey was lying on his back, stiff, playing with his arms in the air, and talking and mumbling.  Jailer Garza was not feeding detainees that day, but she asked Corporal Merrill whether Trey should be taken to a hospital if he did not eat his food, whether he should he be taken to a hospital in a few days if he was still there due to policy and health concerns. Jailer Garza saw that Trey was in the same condition until shift rotation. Jailer Garza was in the booking area doing some filing when Jailer Renteria brought to her attention that Trey was face-down, breathing or gasping heavily. Jailer Garza saw that Trey

was sweating profusely while lying on the front of his chest. Jailer Garza, Jailer Renteria, and every other officer handling "wand duty" watched Trey throughout the night and did nothing in accordance with policy, practice, and custom.

23.    No one called for medical, and Trey was not provided any medical assistance at all. They apparently intended to allow Trey to "sleep it off." Even if they had wanted to call for medical, as indicated elsewhere in this complaint, SHP had failed to provide medical personnel for the weekends in the jail.

24.    Jailer Garza spoke with Jailer Renteria, and one or both addressed their concerns about Trey to Sergeant McCord and Corporal Merrill. Jailer Garza said that they should consider her suggestions, and that while she was not a medical professional, Trey sweating profusely, lying on his chest, breathing rapidly, and breathing heavier concerned her. She said that he probably needed to be seen by medical professionals to receive adequate care. Jailer Garza said that Trey might need an IV, as well as additional treatment. She said that Trey seemed different, and in no way, shape, or form should someone be lying on their back for hours like that, mumbling, even if he is "out of it," and then lying on his chest for the last few hours. She also said that Lieutenant Guajardo called "control," likely because Lieutenant Guajardo had found out about Trey's condition from another officer or jailer, to talk with Sergeant McCord. Jailer Garza said that it was a decision for them (senior officers) to make as to whether to take action. Jailer Garza also said that no action was taken.

25.    Jailer Garza also said that she and Officer Renteria had addressed their concerns to supervisor(s), due to not wanting to go over rank, earlier throughout the night due to seeing many people in that state before. She said, due to her EMT background, that Trey

was in a different condition than she had seen before. Jailer Garza said that she and Jailer Renteria were concerned, and they brought their concerns to the attention of Corporal Merrill and Sergeant McCord.

26.     On April 13, 2024, Sergeant Carol Cunningham was providing food to detainees in booking. At approximately 6:30 a.m., Trey was in cell E-H2. However, since Sergeant Cunningham saw Trey's bizarre behavior, she decided to move him to cell E-H1 so that he would be in view of a camera. Sergeant Cunningham saw that Trey had a difficult time moving and was unsteady on his feet. Sergeant Cunningham assisted Trey to the other cell. Sergeant Cunningham saw, at approximately 11:40 a.m., that Trey was on his back on the cell floor. She called control and asked for the cell door to be opened. Sergeant Cunningham and Jailer Ronny Beldin went into the cell to "assist" Trey.  For Trey to even sit up, Jailer Beldin had to take Trey's left side while Sergeant Cunningham had to take Trey's right side. They just leaned him against a wall but provided no medical assistance. After Trey was given his food, he took a drink out of a cup but spilled most of it. Later, Sergeant Cunningham went back to the cell and once again saw Trey lying on his back.

27.     Corporal Hunter Merrill confirmed Trey's condition.   Corporal Merrill indicated that he was updated on April 13, 2024 that Trey was lying on the cell floor most of the day and moving his arms in the air. Corporal Merrill also said that, at the beginning of his shift on April 13, 2024, he was giving food to detainees in booking. He went to cell EH-1 and tried to get Trey to eat and drink. Trey spoke but did not take the meal tray. Corporal Merrill just left the meal tray on the bench and picked it up about 25 minutes later.  Still, nobody provided any medical assistant to Trey.

28.     Jailer Ronny Beldin also confirmed Trey's dire condition.  On April 13, 2024, when Jailer Beldin was starting his shift at the jail, Sergeant McCord told him that there was a detainee in booking that was probably high. After Trey was moved to cell EH-1, Trey was in view of camera C88. Jailer Beldin, from time to time, would see Trey on the camera feed in the control area. He noticed Trey's strange behavior, and it indicated to him that Trey was under the influence of drugs.  Nothing else was done.  They were waiting for Trey to recover, or not.

29.     Jailer Beldin saw Sergeant Cunningham go into cell EH-1 to give food to Trey. Jailer Beldin heard Sergeant Cunningham asking Trey if he wanted to eat, but Jailer Beldin did not hear any response. Jailer Beldin then suggested that they help Trey sit up. Jailer Beldin had to take Trey's left arm, while Sergeant Cunningham had to take Trey's right arm. They then got Trey into an upright position and leaned him up against a wall. After Sergeant Cunningham provided a meal tray, Jailer Beldin exited the cell to continue other duties. He continued to observe Trey's strange behavior throughout his shift.  At the end of his shift, he told Sergeant McCord that Trey was still in booking and had not been magistrated. He also told Sergeant McCord that Trey had been moved to EH-1 to be able to have him in view of a camera. Jailer Beldin said that they all discussed how Trey's condition had been when he first arrived, as well as his condition throughout Jailer Beldin's shift. Discussion and observation without intervention was ineffective.

30.     On Sunday, April 14, 2024, Jailer Renteria went into the cell to check on Trey at approximately 1:00 a.m. He said that Trey was mumbling and not saying anything. Jailer Renteria said that he texted Lieutenant Guajardo that Trey was unresponsive. Jailer Renteria told  Lieutenant  Guajardo  that  Jailer  Renteria  thought  that  Trey  needed  to  go  to  the

emergency room. Lieutenant Guajardo would not allow Trey to go to the emergency room, advising that Trey was, quote, "detoxing." Jailer Renteria further said that Lieutenant Guajardo's response was, "If you think he needs to go to the ER, then go; It's always safer." These inconsistent statements made little sense, because Jailer Renteria was not permitted to make the decision to take Trey to a hospital and then to take action to transport him. Policy, practice, and custom was just to let someone who was detoxing "sleep it off" and not to treat them, either through a detox protocol or by transporting the person to a hospital. Lieutenant Guajardo would later confirm that she was told that Trey was exhibiting poor signs of health, but she decided not to call EMS due to Trey experiencing drug withdrawals.

31.     On April 14, 2025, Jailer Garza told Jailer Renteria, by Jailer Garza's recollection at approximately 4:00 a.m., that Corporal Merrill, Sergeant McCord, and Officer Mathis were going to check on Trey because he was not responding. Sergeant McCord and Jailer Renteria ultimately entered the cell and found Trey, deceased. They rolled Trey onto his back. Trey's right arm was stiff, and saliva was coming out of his mouth. Trey had been deceased for some time.

32.     Jailer Deveryck Mathis indicated that, on April 14, 2024, at approximately 4:12 a.m., he took a trustee out to the sally port for a break. When he came back from the break at approximately 4:17 a.m., he went to check on Trey. When he looked through the cell window, Trey was unresponsive and appeared to not be breathing. As he walked to control, he told Corporal Merrill. Corporal Merrill then went to check on Trey and requested backup. When Jailer Mathis arrived at the cell, he saw Corporal Merrill and Sergeant McCord checking Trey's pulse. Trey was not breathing. Jailer Mathis saw that Trey's right arm and his legs were stiff. Jailer Mathis also noted that, since Trey arrived at the jail two days prior, of

the few times he had contact with Trey most of the time Trey was barely able to walk and was always breathing heavily. Also, when he saw Trey on a camera feed, Trey would bang his head on a cell window. He also indicated that anytime he would do a cell check, he would make sure that Trey was breathing. This policy, practice, and custom of just being sure that a person is breathing is wholly inadequate. When a person stops breathing, it may be too late to save the person's life.

33.    Jailer Garza indicated that, at approximately 4:25 a.m. on April 14, 2024, she heard Corporal Merrill while on a cell check. She heard Corporal Merrill calling for Sergeant McCord and asking to go to booking to see Trey. After a number of minutes, Jailer Renteria called booking. Corporal Merrill took the phone call and asked if Jailer Renteria knew CPR. Jailer Renteria called for Jailer Mathis and asked that he make his way to control to relieve Jailer Garza, due to Jailer Garza knowing CPR. Even so, Jailer Garza admitted that her CPR license had expired. She said that she would help if she could. Jailer Garza checked for a pulse on Trey's neck as Sergeant McCord checked for numerous pulses from neck to wrist before their arrival. Jailer Garza felt nothing and asked how to proceed, and if anyone had attempted CPR.

34.    When Sergeant McCord turned Trey onto his back, he was stiff. Jailer Garza saw Trey as he was turned over and noticed bruising and that rigor mortis had occurred. Jailer Garza indicated that she thought Trey had been "down longer," but she was not sure due to the cell checks and what could be seen on cameras. Sergeant McCord inexplicably did not know what to do in that moment, according to Jailer Garza, due to supposedly never being put through something like that before. This reflected no training.

35.    Sergeant McCord left the cell and went to the phone to call Lieutenant Guajardo to notify her and asked what Sergeant McCord should do. Sergeant McCord asked if they had started CPR. Lieutenant Guajardo asked if they had started CPR. Sergeant McCord inexplicably said that he did not know CPR. Lieutenant Guajardo asked if Jailer Garza knew CPR, and Sergeant McCord told Corporal Merrill to call control and ask. Jailers Garza and Renteria arrived in booking and they went to the cell so that someone could start CPR. Deputy Wilson ultimately arrived in booking and went to the cell and started CPR.  It was too late.

36.    Lieutenant Melissa Guajardo indicated that, earlier on Sunday, April 14, 2024, she received a message from Jailer Renteria about Trey. She learned that Trey was breathing heavily and sweating. She admitted that Jailer Renteria was concerned about Trey's situation. They spoke about whether to call EMS to check out Trey, which they should have done, but they did not do so because they believed that Trey was withdrawing from drug use. The policy, practice, and custom was to let such a person "sleep it off.," They ended the call. Lieutenant Guajardo then received another call at approximately 4:27 a.m. on April 14, 2024. Predictably, as Sergeant McCord said, they had a problem. Sergeant McCord said, "I think inmate Kaiser is dead."

37.    DeWitt County Sheriff's Office Deputy Kenneth Wilson (#1216) indicated that, on April 14, 2024, at approximately 4:30 a.m. he was dispatched to 208 East Live Oak Street, which is the DeWitt County Sheriff's Office in Cuero, Texas. The dispatch was regarding an unresponsive inmate. He further indicated that Sergeant Juan Ruiz (#1206) arrived at the jail at approximately 4:57 a.m., while Sergeant Kirk Fowler (#1204) arrived at the jail at approximately 9:09 a.m. When Deputy Wilson arrived at the jail at approximately

4:36 a.m., he entered the booking area, jail staff told him that there was an unconscious detainee in Cell E-H1. Deputy Wilson saw Trey, lying on the cell floor in a pair of shorts with his right arm extended upward and his fist closed. The deputy entered the cell and attempted to communicate with Trey. Trey was unresponsive. The deputy saw that Trey's body was stiff. He grabbed Trey's wrist and checked for a pulse, but there was not one. He also saw a pool of saliva around Trey's mouth. Trey was cold to the touch. The deputy began chest compressions. Deputy Wilson stayed through the arrival of EMS personnel and continued attempts to save Trey's life, without success. Deputy Wilson collected and/or created evidence, including photos and his bodycam/dashcam recordings.

38.    Patrol Sergeant J. Ruiz (#1206) learned at approximately 4:34 a.m. on April 14th, 2024 about an unresponsive detainee at the DeWitt County jail. He indicated that he arrived at the jail at approximately 4:57 a.m. and spoke with Sergeant C. McCord in booking. Among others, he also spoke with Deputy Wilson. Deputy Wilson told Sergeant Ruiz that EMS told him that Trey was deceased, and nothing else could be done. Sergeant Ruiz spoke with EMT-P Gerald Clark, who was near the holding cell in which Trey was found. EMT-P Clark said that, from his training and experience, Trey had been deceased for several hours. The paramedic further said that Trey's body was suffering rigor mortis.

39.    Sergeant Ruiz also spoke with Jailer Renteria. Sergeant Ruiz said that he could tell that Jailer Renteria was very upset. Jailer Renteria told Sergeant Ruiz, "He tried; he really did." He said that he had pushed to have Trey taken to the emergency room, but in substance that he was unable to do so because he was just an officer/jailer. Jailer Renteria told Sergeant Ruiz that Trey had been breathing hard and fast. Jailer Renteria also told Sergeant Guajardo that he just did not want Trey's heart to stop. Jailer Renteria showed to

Sergeant Ruiz his phone, presumably text messages, so that Sergeant Ruiz could read them. Jailer Renteria also said that he had spoken with Sergeant McCord, and Sergeant McCord told him that Trey was just detoxing. Jailer Renteria said that he understood as much, but that something was different about Trey apparently than typical detoxing.

40.    Cuero EMS records for Trey indicate that emergency personnel were called to the jail on April 14, 2024, and the chief complaint was "unresponsive" for 30 minutes. This was false and likely based on what EMS personnel were told by jail personnel, the latter attempting to avoid liability for Trey's death.  Signs and symptoms indicated that rigor mortis had already set in.  There was dependent lividity, and Trey had aspirated fluid. Trey's skin was cold to the touch. His right arm was up and locked in place, and the right side of his body was rigid. Clearly, he had been unresponsive, and deceased, for much longer than 30 minutes.

41.    Unit 361 had been dispatched to the jail and found Trey lying supine in a holding cell with DeWitt County Sheriff's office Deputy Wilson doing chest compressions. EMS personnel requested a second unit. Trey's right side was completely rigid, with his right arm up, and locked in a 30-degree angle. There was a small pool of fluid next to his head that had come from his mouth. He was cold to the touch with lividity forming in upper extremities. CPR was discontinued after the second EMS unit, Unit 362, arrived while Trey's core body temperature on his left side read 97.3 axillary, his body temperature was unreadable on his right side where rigor mortis had begun to take place. Justice of the Peace Peggy Mayer was called to the scene.

42.    Captain Jerry Garza with the DeWitt County jail, who served as its

administrator under the authority of the sheriff, completed and presumably filed with the Texas Commission on Jail Standards an inmate death reporting form. The form indicated that Trey was booked into the jail on April 12, 2024 at 8:50 p.m., and it falsely listed a 4:25 a.m., April 14, 2024 time of death. The form admitted that Trey died in a holding cell. The form indicated that DeWitt County supposedly did not know or whether Trey was under the influence of alcohol or drugs at the time of his death. The form confirmed that Texas Ranger Brent Johnston would conduct the investigation regarding any criminal conduct resulting in Trey's death.  Texas Rangers only investigate custodial deaths for any potential criminal conduct and not for the purpose of determining civil liability or constitutional violations.

43.    After Trey's death, Captain Jerry Garza told Texas Commission on Jail Standards ("TCJS") critical incident inspector Wendy Wisneski that, at the time of Trey's death, medical staff were in the jail only from 8:00 a.m. to 5:00 p.m. Monday through Friday each week. He further indicated that SHP had not hired a nurse to work weekends. Captain Garza also said that Trey was put into a cell within camera view because he exhibited unusual behavior. He also indicated that DeWitt County investigator Kirk Fowler completed the investigation of Trey's death, or at least completed an investigation report. Captain Garza confirmed that Texas Ranger Brent Johnston would conduct the investigation of any criminal conduct related to Trey's death. Captain Garcia further affirmed that at the time of Trey's death, Trey was the only detainee in the booking department being housed in cell EH-1. There were no other detainees in the area. Captain Garza indicated that the booking area was "empty of inmates." Thus, there was lots of observation.  But there was no intervention.

44.    The Texas Ranger investigating Trey's death confirmed some things. First, the Ranger confirmed that there was no unclothed search conducted on Trey. It thus makes little

sense for the arresting officer or anyone else with the DeWitt County Sheriff's Department to assert that Trey had been violent. If he were violent, an unclothed search would have been conducted to discover any weapons or other contraband. Further, it was the Ranger's opinion that the last time Trey could be seen moving on video recordings was at 1:22 a.m. on April 14, 2024. This was over three hours before anyone at the jail requested EMS.

### 3.    Custodial Death Report

45.    Carl Bowen, with the DeWitt County Sheriff's Department, filed a custodial death report with the Attorney General of Texas regarding Trey's death. The report indicated that Trey was only 34 years old at the time of his death.  The report confirmed that Trey was in a holding cell and was a pre-trial detainee. The report indicated that Trey appeared intoxicated by alcohol or drugs and that he was not apparently a danger to anyone in the jail, as he did not barricade himself or initiate a standoff, resist being handcuffed or arrested, physically attempt to or assault an officer, gain possession of an officer's weapon, verbally threaten others including law enforcement, escape or attempt to escape or flee custody, or attempt to gain possession of an officer's weapon.

### 4.    Video Recordings Summary

46.    Video recordings of a portion of Trey's incarceration shed further light, through consistent action and inaction of those working in the jail, of DeWitt County policies, practices, and customs.  Plaintiffs provide here only a general description of some relevant occurrences captured by those recordings.  Plaintiffs do not necessarily agree as to times specified below, because the times are from Defendant's recording equipment. Plaintiffs have no personal knowledge as to how the equipment functioned, or whether the correct time(s) are displayed in recordings.  Further, times displayed, unless they specifically

refer to actual times, may at times refer to minute markers in recordings and may at other times refer to actual times. The events are depicted in chronological order. The first recording addressed here appeared to be for April 13, 2024, from 7:04 a.m. to 10:59 p.m. Plaintiffs provide descriptions of some relevant events in that recording and then continue in chronological order for events in different recording(s).

47.     At some point, Trey sits by the window of the cell, moving and stretching out his arms as if he is speaking to somebody. He does not move from his seat by the window, but he is not sitting still. A jailer ("Jailer 1") passes his cell (11:30) and appears to scan a badge to log a cell check without actually looking into the cell or making contact with Trey. Trey remains seated for the remainer of this 30-minute segment, moving only his arms in a slightly sporadic manner.

48.     Jailer 1 conducts another "cell check" at 31:20 in the same manner as before—tapping his card in passing without making contact with Trey. Trey continues waving his arms around as if he is speaking with somebody, but nobody else has yet to be seen in the cell with him. At 52:00, Jailer 1 performs an identical cell check to the two before. After nearly an hour alone in the cell, nobody has made contact with Trey or checked on Trey in any meaningful way. Trey extends his arm out in front of him and then appears to touch his hand to his chest before slumping over slightly to the side for a few moments.

49.     Trey begins looking through the window as if trying to get someone's attention, but nobody responds to these attempts. After a few minutes of these attempts, Trey sits back in his original position. At 1:10:30, Jailer 1 returns for a cell check. It appears that he may glance at Trey, but he does not make contact long enough for Trey to express any

concern or discomfort. Jailer 1 returns at 1:28:30 for another cell check and does not make contact with Trey.

50.    Trey appears to continue talking to himself or somebody not visible in the cell. There is nobody else in the cell.  At 1:44:00, Trey begins to lean to his side and slowly fall off of the bench on which he was seated. He struggles to pull himself back up but can only manage a kneeling position, now resting his head in the seat. He stands with the assistance of the bench after several minutes and manages to get to the window of his cell door. He calls out for assistance using the intercom next to the door. A jailer passes shortly after, taps his card to log a cell check, and passes by without acknowledging Trey's pleas for help. Trey paces around his cell and leans against the wall in a way that shows clear discomfort before he sits back down in the same position as before.

51.    At 2:12:40, Jailer 1 performs another cell check without making contact with Trey. Trey later begins to lean to his side and sway, clearly having difficulty remaining upright. The jailer performs an identical "check" at 2:28:00.

52.    Trey falls to his side once again but this time does not get back up. He occasionally makes slow movements with his arm, which is now the only signs of life. Jailer 1 performs a "check" at 2:47:20 and does not acknowledge Trey's physical state. Trey falls from the bench into a kneeling position on the ground, leaning his upper body against the bench. After a bit of time, he pulls himself up and walks a lap around his cell before sitting back down. His movements are awkward and atypical for a healthy person.

53.    At 3:06:05, a new jailer ("Jailer 2") performs a cell check, this time looking into the cell in passing. Still, this jailer does not make contact with Trey. Another cell check

is performed at 3:26:17 by Jailer 2, who, once again, merely glances into the cell while walking past.

54.     Trey is leaning to the side and contorting his body in an awkward manner when Jailer 2 performs another cell check at 3:49:00. The jailer looks into his cell while passing but ultimately walks away shaking his head as if Trey is nothing more than an annoyance. Trey once again rolls onto the ground and leans over the bench for some time.

55.     Trey falls back into a sitting position, unable to kneel any longer, then falls to his back stiffly. While he occasionally moves, his movements are weak and were cause for concern for all observing him. Jailer 2 logs a check at 4:06:15 and looks into the cell to observe Trey/  Trey is at this point laying limply on his side on the cell floor.

56.     A meal tray is brought at 4:31:00 while Trey lays on his back against the floor. When he does not rise to collect his tray, the jailer enters his cell, shortly followed by another. They pull Trey to a sitting position and set him against the wall before leaving.

57.     Jailer 2 performs a cell check at 4:46:00, but does not make contact with Trey. Jailer 3 returns at 4:56:15 and observes Trey through the window but takes no other action.

58.     Another cell check is done at 5:05:21, and the jailer, again, merely glances into the cell at Trey. At 5:20:20, Trey appears to slump over. His movements are weak and slightly sporadic. While laying diagonally on the cell floor, stiff and clearly in poor health, Jailer 2 logs a cell check at 5:26:36. He looks in and can see Trey's position on the floor but does nothing to assist him or check on his wellbeing.

59.     Jailer 3 passes by at 5:44:00 along with a group of detainees. The jailer and

several detainees stop to look into the cell as if concerned, but nobody enters. Jailer 2 passes

at 5:45:27 and conducts a cell check, but he also does not enter the cell.

60.     Another check is conducted at 6:05:18 while several detainees pass back

through. Trey is lying on his back, making few if any movements, and each person passing

by chooses to ignore him. Trey makes little movement between this time and the next cell

check at 6:26:05. The jailer glances into the cell but makes no effort to properly observe him.

61.     Jailer 2 logs a cell check at 6:47:04, merely glances into the cell in passing.

There is no activity until the next cell check at 7:05:00 by a new jailer ("Jailer 4). This jailer

looks into the cell longer than the previous jailers but still does not stop for a full observation.

Another check is performed at 7:22:23 by Jailer 4, who pays little attention to Trey's poor

state of health.

62.     A cell check is logged at 7:44:08 and this time Jailer 4 pauses at the window

to actually observe Trey. He observes Trey for a few moments before moving on. Trey does

not move during this observation.

63.     A cell check is logged at 8:03:19. Jailer 4 barely looks into the cell. Any

movements made by Trey are an indication that he is in immense amounts of pain and/or

distress. Despite this, Trey is not properly checked on during the cell check conducted at

8:23:25.  Another check is logged at 8:46:50 by Jailer 4, who does little more than glance

into Trey's cell while he lay on the ground.

64.     At 9:05:33, a cell check is logged by Jailer 4, and he merely glances into the

cell while walking to and from the cell. At 9:14:30, Jailer 3 walks to the door of Trey's cell,

appearing to acknowledge the poor state he is in. He opens the door and enters the cell but does nothing more than remove the untouched meal tray from Trey's cell. Jailer 4 conducts another cell check at 9:25:44 and merely glances into his cell in passing. Trey is still lying on his back with his arms in the air, showing signs of delirium or other medical crisis.

65.     Jailer 3 passes by at 9:33:45 but does not look into Trey's cell. A cell check is conducted at 9:47:30 by Jailer 4, who at first passes by so quickly that he could not properly tap his badge to the sensor. He looks into Trey's cell as he passes, but nothing more.

66.     At approximately 10:00:54, Jailer 3 passes by with a detainee but neither looks into Trey's cell. Jailer 4 passes by at 10:02:22 and conducts a cell check, looking briefly into Trey's cell. Jailer 3 passes through again at 10:07:45 but does not appear to pay any attention to Trey. Jailer 4 logs another check at 10:22:26. At this point, Trey is moving but has not changed positions for an extended period of time.

67.     Jailer 4 passes by at 10:40:35, but does not log an observation. He looks into Trey's cell but takes no other action. On his way out, he taps his badge to log an observation.

68.     A new jailer ("Jailer 5") conducts a cell check at 11:01:56, but she also merely glances into the cell in passing. Shortly after, at 11:03:11, another jailer comes to the cell with a meal tray and knocks on the window. Trey does not immediately respond but can be seen with his arms outstretched in front of his body when the door is opened. The jailer sets the food tray down on the bench, far outside of Trey's reach. Jailer 5 returns and logs another check at 11:22:40 but does not make contact with Trey.

69.     There is another check at 11:42:00 by Jailer 5. She looks into the cell as she

passes but does not stop to better observe Trey. The video ends at 11:59:59. Trey is still moving his limbs but has not moved from his laying down position in quite a while.

70.     At 0:02:45, Jailer 5 walks up to the cell window to watch Trey, who is now lying face-down on the floor. She hesitates as she is walking away, returns to observe him a bit longer, and then walks away. Trey's legs begin twitching uncontrollably. While this is happening, two jailers pass by the cell, one of which logging a cell check at 0:06:13. Despite the concerning movement displayed by Trey, both jailers leave without checking on him. These are the final movements Trey is ever seen making. A jailer enters the cell at 0:18:48 and leans over Trey to observe him, then leaves. At 0:25:33, a cell check is conducted. This jailer looks into Trey's cell while passing but shows no concern for his still body lying face-down on the floor.

71.     Jailer 6 returns for a cell check at 0:43:54 and pauses to look into the cell at Trey's motionless body but ultimately walks away without taking any action. Jailer 6 returns again at 0:50:05 with another detainee, but only the detainee pauses in concern before following Jailer 6 out. They return at 1:03:02, when Jailer 6 glances into the cell before logging a cell check. At this point, Trey has ceased all movement and is likely deceased. Jailer 6 returns at 1:25:48 and logs a cell check before looking into the cell. He pauses to get a better look at Trey but continues on as if unconcerned with his condition.

72.     Jailer 6 returns at 1:44:30 to log another cell check. He backtracks as he is walking away to observe Trey, who has not moved at all since the last two cell checks, but eventually does continue walking away. At 1:53:47, Jailer 5 passes by and pauses at Trey's cell for a few moments to watch him. Despite him showing no signs of life, Jailer 5 walks

away without taking any action.

73.    Jailer 6 logs a cell check at 2:07:03 but does not appear to even look into Trey's cell initially. On his way back, he seems to notice Trey's condition and pauses in front of the cell for just a few moments before walking away. Another check is conducted at 2:25:26, and Jailer 6 does a double-take while walking away to look at Trey, who has not moved in over an hour. Still, the jailer walks away.

74.    At 2:40:35, a jailer ("Jailer 7") passes Trey's cell with another detainee. The jailer looks into Trey's cell in passing. Jailer 6 passes by soon after, and logs a cell check on his way out after only glancing into the cell.

75.    At 3:05:20, Jailer 7 and the detainee from before pass back through.  While neither look into the cell initially, Jailer 7 comes back around to observe Trey for a few moments. Still, he takes no action. Jailer 7 passes through again at 3:22:50 but pays no mind to Trey's cell as he logs a cell check.

76.    Jailer 7 returns to log another cell check at 3:46:12, only looking into the cell as he walks past. He returns a minute later and looks through the window to observe Trey for a few moments, only to leave again.

77.    Another observation is logged at 4:04:31 by Jailer 7, who looks into the cell briefly as he walks past. Jailer 6 walks through shortly after with an inmate, both of which backtrack to look into Trey's cell. They laugh and end up walking away after observing Trey's body for some time. They return a few minutes later and again look into Trey's cell only briefly. At 4:23:58, Jailer 7 comes back to look into Trey's cell, knocks to get his

attention, walks away, only to return shortly after and enter his cell. This is the first time anybody has entered Trey's cell since he stopped moving over 4 hours before.

78.    He stands over Trey for about a minute, then exits the cell. He returns with two more jailers and enters the cell while another detainee stands outside. All three jailers exit and seemingly understand the severity of the situation—that Trey is deceased and has been for an extended period of time. More jailers return and enter Trey's cell, but they exit just as quickly.

79.    A deputy (later identified as Deputy Wilson) arrives at 4:39:35, enters Trey's cell and begins chest compressions. EMS arrives at 4:41:32 with a stretcher. The video ends at 5:56:55 with everyone leaving Trey's cell, but without him placed on a stretcher or removed from the cell.

5.    Autopsy Report

80.    Vickie Willoughby, DO, Deputy Medical Examiner at the Travis County Medical Examiner's Office, performed an autopsy of Trey pursuant to written authorization by Justice of the Peace Mayer. Investigator Kirk Fowler and Deputy Kenneth Wilson, both with the DeWitt County Sheriff's Office, were present. Dr. Willoughby provided the opinion that Trey died from hypertensive cardiovascular disease, but with a contributing condition of toxic effects of methamphetamine and mitragynine. The doctor wrote that it was her opinion that, other than hypertensive cardiovascular disease, another "significant factor contributing to [Trey's] death is the toxic effects of methamphetamine and mitragynine." Plaintiffs contend that if Defendants had treated (in the case of the hospital Defendant) or obtained (in the case of the other Defendants) methamphetamine ingestion treatment for Trey at a hospital emergency room before Trey was unresponsive, Trey's suffering would have been less and

he would not have died.

6.    Texas Commission on Jail Standards

81.    TCJS reports regarding other incidents or areas of noncompliance with TCJS standards can show policies, practices, and customs including but not limited to the policies, practices, and customs alleged below in this complaint.  Since it is exceedingly rare for a plaintiff to have access to or personal knowledge of specific details regarding the existence or absence of a defendant's internal policies or training procedures before discovery, a plaintiff is not required to allege at the pleading stage the level of detail that would be required to prove his or her claims at trial or in response to a motion for summary judgment. That standard applies equally to TCJS reports regarding which Plaintiffs may obtain more information through discovery. Plaintiffs are only required to allege enough detail to provide sufficient fair notice of the general nature and substance of Plaintiffs' allegations and further demonstrate that Plaintiffs' claims have facial plausibility.

82.    TCJS reports and documents regarding the County's jail inspections further demonstrate enumerated and de facto policies, practices, and customs that, when applied individually or working together, caused, were proximate causes of, producing causes of, or were moving forces behind damages (including death) asserted in this pleading. TCJS reports can show not only specific policies, practices, and customs but also can point to a pervasive carelessness for or deliberate indifference to the needs of detainees. The County's sheriff, the County judge, the County's jail administrator, and a County commissioner's court representative are always notified in writing of the results of TCJS inspections.

83.    The DeWitt County jail was put on notice long ago about the importance of appropriately screening jail detainees and not only making appropriate observations but also

taking action based on observations. On or about September 7th, 2010, the TCJS inspected the DeWitt County jail. As a result of the inspection, the TCJS determined that deficiencies existed. The TCJS urged DeWitt County to give areas of non-compliance its serious and immediate consideration and to promptly initiate and complete appropriate corrective measures. The TCJS warned DeWitt County that its failure to initiate complete corrective measures following receipt of a notice of non-compliance could result in issuance of a remedial order. The TCJS determined that DeWitt County was not completing the entire screening form during booking for all detainees when they were booked into the jail. The TCJS also noted, after reviewing documentation, that DeWitt County was not completing face-to-face observations of detainees at intervals not exceeding 30 minutes in areas in which detainees were known to be assaultive, suicidal, mentally ill, or who had demonstrated bizarre behavior.

84.    On February 14, 2013, the TCJS inspected the DeWitt County jail. The TCJS found two suicide screening forms on which the "yes" box was checked, indicating that the detainee had previously attempted suicide. However, the jail had failed to contact a judge as required by law. The inspector would follow up in 30 to 60 days to ensure corrective measures were fully implemented.

85.    On November 30, 2015, the TCJS inspected the DeWitt County jail. When reviewing medical files, an inspector noted an issue with a new mental health screening document. If a detainee provided certain answers as reflected by that document, a jail supervisor was to be notified. However, such a notification was not documented in the appropriate box. This may have been found in a single detainee folder, as the folder was held so that a second evaluation could occur. The TCJS appears to have required the jail captain to

have other folders reviewed by supervisor as jail staff continued working with the new mental health screening documents.

86.    The TCJS inspected the DeWitt County jail on October 30, 2019. The TCJS inspector determined, when reviewing inmate classification files, that at times detainees were not being immediately reclassified after receiving disciplinary sanctions as required by minimum jail standards. The inspector recommended that jail administration train all classification officers and supervisors to ensure that reclassification was always conducted as required by Texas minimum jail standards.

87.    The inspector also determined, when reviewing emergency restraint chair logs, that the logs did not include all of the minimum jail standards-required information. The inspector recommended that jail staff use a more detailed face-to-face observation form instead and which would include all of the minimum standards. Jail administration had to email the inspector the new form to replace the current log within the next 30 days.

88.    The TCJS inspector also saw what could only be described generally as the jail being a mess. When conducting a walk-through, the inspector saw multiple vents obstructed by toilet paper, multiple light fixtures with combustible materials on light covers, and graffiti on the walls. The inspector also saw office furniture and different types of equipment, filing cabinets, and chemicals stored in the jail's sally port. The inspector also noted, when viewing detainee holding cells, that the floor still needed to be repainted. The TCJS required jail administration to implement a plan of action to correct all sanitation issues and email the plan of action to the inspector within 30 days.

89.    The TCJS inspected the jail on October 29th, 2020. The inspector, when reviewing an emergency restraint chair log, determined that the log had been corrected from

the prior year's inspection. However, jail staff were not checking detainee extremities when conducting observation checks. The inspector recommended that jail administration retrain staff to ensure best practices were followed when using a restraint chair. This would include documenting extremities checks. Jail administration had to develop and email to the inspector a plan of action within 30 days, as well as a copy of a completed training roster.

90.     The inspector also determined, when reviewing medical files, that at times files containing sick call requests were not being completed properly. Missing information included start and end dates of prescribed medications. The inspector had to inform jail administration that, even though medical services were apparently contracted out to a company, medical files had to continuously be monitored by jail staff for accuracy. The inspector thus pointed out the joint responsibility for detainee medical care. As a result, a meeting was scheduled with medical vendors to review documentation policies. The inspector required jail administration to monitor and review all medical files to ensure their completion and if any files were found to be in need of correction, jail administration had to immediately notify the inspector along with any revisions made.

91.     Finally, the inspector noted, when walking through the jail, various items being stored in the sally port that if used in a way other than their original design could be a safety issue. The inspector noted that some progress had been made in removal of some of the items, but that a safety issue still existed. The inspector required jail administration to remove those items within 10 days after receipt of the inspection report. If the jail failed to do so, the inspector would issue a notice of non-compliance. Jail administration had to provide the inspector with video or photo documentation of the completion.

92.     The TCJS inspected the jail on October 22, 2021. While reviewing medical

records, the TCJS inspector saw several medication administration records (MARs) from various detainees which were not properly completed. There were medication administration records with blanks on various dates, and one could not determine from the documents whether a detainee had actually received or instead refused medication. The inspector noted that the jail had a contracted medical provider who was on site at the time between 8:00 a.m. and 5:00 p.m., and that jail staff distributed evening medication.  Thus, it appears that the woefully limited hours for medical personnel far preceded events in this case.

93.     The inspector noted that all blanks on the medication administration records were for evening medication pass. The inspector required jail administration to conduct training with all jail staff to ensure MARs were being completely and properly completed. The training had to occur and be completed by all staff within the following 14 days. Moreover, documentation proving that the training had occurred had to be emailed to the inspector.

94.     In an ongoing issue, when walking through the jail, the inspector once again saw numerous cells with excessive amounts of graffiti. The inspector also saw numerous cells with showers with peeling paint and excessive soap scum. Jail administration had to submit a plan of action to the inspector within the following 14 days as to how such issues would be addressed and corrected.

95.     The TCJS inspected the jail on January 10, 2023. As a result of the inspection, the TCJS once again determined that deficiencies existed. As was true with other Texas jails determined to have deficiencies, the DeWitt County jail was listed at the TCJS website in the short list of jails found to be non-complaint. DeWitt County was urged to give areas of noncompliance its serious and immediate consideration and to promptly initiate and complete

appropriate corrective measures. The TCJS, again, reminded the County that failure to initiate and complete corrective measures following receipt of the notice of noncompliance could result in issuance of a remedial order.

96.    The inspector, while conducting a desktop limited compliance review and reviewing requested random restraint logs, determined that jail staff exceeded the maximum 15-minute interval observation checks required by minimum jail standards by as little as two minutes, and by as many as 13 minutes, on multiple occasions.  The inspector required DeWitt County Jail Administration to submit a plan of action within 14 days as to how it would address the deficiency, and the plan had to include training of all jail staff in the Texas minimum standard for this issue. The inspector also required that documentation of the training be sent to the inspector immediately upon completion. Further, once the training was completed, all use of any restraint devices had to be sent to the inspector for review and audit until further notice.

97.    Further, the inspector determined when reviewing recreation reports and logs that there were multiple occasions during which the detainee population was returned to housing assignments before the allotted one hour of required recreation time. There was no documentation or reasoning as to why detainees did not receive the minimum required amount of recreation.  The inspector required DeWitt County Jail Administration to submit a plan of action within the following 14 days as to how it would correct this issue. Further, once the plan was submitted, and all training surrounding that issue was completed, documentation had to be provided to the inspector. Further, on a weekly basis until further notice, random recreation reports and logs had to be sent to the inspector for review and audit.

98.    The TCJS inspected the jail on February 25, 2025. After conducting a walk-through of the jail, including detainee living areas, the inspector saw that detainees were being allowed to use blankets and sheets to cover their bunks. This made visual observation by jailers impossible. The inspector brought this to the attention of jail administration, and informed administration that detainees had to be visible at all times in jail cells.  Despite the death at issue in this case, the jail persisted in its non-compliance with bare minimum standards.  The inspector required jail administration to provide the inspector with a plan of action detailing how it would address the issue. The inspector also reminded the jail administration that constant observation of detainees had to be maintained at all times. This should have been no surprise to jail administration because in Texas alone, over the last several years, more than one lawsuit has been filed as a result of detainees being able to die by suicide after covering bunks or cell doors with sheets and/or blankets. This violated all known jail standards.

99.    The inspector also determined while going through housing areas that a continuing issue with excessive graffiti persisted. Once again, the inspector brought up the issue to jail administration. Jail administration apparently was not taking seriously the responsibility to operate a safe and sanitary jail.

100.    Finally, before coming on site, the inspector learned of a complaint filed against DeWitt County by the Texas Department of Criminal Justice. The complaint alleged that DeWitt County failed to contact the TDCJ's health service liaison because of a particular detainee taking a medication that required verbal telephonic communication by DeWitt County.  This was listed in Technical Assistance Memorandum number 24-05.  The DeWitt County jail administrator told the inspector that jail administration had investigated the issue

and learned that the DeWitt County had failed to do the appropriate notification. A plan of action was submitted to correct the problem in the future.

C.    Liability of DeWitt County and SHP

1.    Introduction

101.    Plaintiffs set forth in this section additional facts and allegations supporting liability claims against the County and SHP pursuant to *Monell v. Department of Social Services,* 436 U.S. 658 (1978) and/or other applicable law. It is Plaintiffs' intent to show that all facts asserted in this pleading relating to policies, practices, and customs of the County and SHP support such liability claims, and not just facts and allegations set forth in this section. Such policies, practices, and customs alleged in this pleading, individually or working together, and whether supporting conditions of confinement or episodic acts and omission claims, were moving forces behind and caused the constitutional violations and damages (including death) referenced herein. There was no legitimate governmental objective for these policies, practices, and customs, and they are pled individually and alternatively. The County and SHP knew, when the County incarcerated the decedent, that their personnel, policies, practices, and customs were such that they could not or would not meet constitutional obligations to protect the decedent, including but not necessarily limited to through provision of medical care. Further, consistent action and inaction by the County and/or SHP employees or agents specifically with regard to the decedent or generally regarding other detainees confirm policies, practices, and customs alleged in this complaint. The County made decisions about policy and practice which it implemented through its commissioner's court, its sheriff, its jail administrator, or through such widespread practice

and custom that such practice and custom became the policy of the County as it related to its jail. SHP likewise made decisions about policy and practice which it implemented through appropriate employees, decisionmakers, or policymakers, and in the alternative or in addition through partnership or joint action with the County. The County is liable for SHP policies, practices, and customs that were moving forces behind damages sought in this complaint. The Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege the identity of chief policymakers at the pleading stage.

102.    There were several policies, practices, and customs of the County and SHP which were moving forces behind, caused, were producing causes of, or proximately caused the decedent's suffering and death, and other damages referenced in this pleading. The County and SHP made deliberate decisions, acting in a deliberately indifferent (applied only to episodic acts, if any, but not to alleged conditions of confinement) or objectively unreasonable manner, when implementing or allowing such policies, practices, and customs to exist. Further, when the County and SHP implemented or consciously allowed such policies, practices, and customs to exist, they knew with certainty that the result would be serious injury or illness, suffering, or death. There was no legitimate governmental objective for the relevant policies, practices, and customs.

### 2.    SHP's Agreement with DeWitt County

103.    The business of providing, or in some situations unfortunately not providing, healthcare and mental health care to prisoners in county jails throughout the United States is big business. There are untold millions of dollars to be made by private companies, such as SHP, promising and contracting to provide such services. SHP is no exception to the rule that such companies are in business to make significant profits. SHP is one of the fastest growing

for-profit companies, and it fuels that growth in part by promising countys that it will save them costs incurred in treating medically and mentally ill people in their jails.  And it has and has had for some time well-known problems.  Many jail detainees have died under its watch, and it has been sued numerous times.  Despite this well-known information, available through public records and news reports, DeWitt County chose to contract with and delegate to SHP care and treatment of DeWitt County jail detainees, including any necessary policymaking authority.

104.    DeWitt County Commissioners Court meetings records indicate that, at a regular meeting held on August 26, 2024, county commissioners considered approval of a renewal rate for the Health Services Agreement between SHP and DeWitt County for a period beginning October 1, 2024 and ending September 30, 2025. When doing so, as with prior instances of the County contracting with SHP, the County was on notice of all public records and news reports regarding SHP, including the numerous cases in which it had been sued for deficient healthcare in jails.

105.    Aside from the decedent's death, many other incidents of suffering and death have also occurred while SHP was providing healthcare in jails across the country. In fact, at least 50 people who were under the care of SHP died over roughly the last decade, as found through an investigation by The Marshall Project and The Frontier, published July 30, 2024. https://www.themarshallproject.org/2024/07/30/oklahoma-jail-turn-key-health-deaths    The reporters, to examine and determine SHP's practices, obtained records including internal documents and emails between SHP leaders and public officials, in nearly 70 counties across Texas, Oklahoma, Arkansas, Louisiana, Colorado, Kansas, and Montana. They also reviewed over 100 lawsuits regarding jail deaths and injuries.

106.    The reporters determined that SHP staffed jails with mostly licensed practical nurses or medical assistants. Such employees can be licensed within a year or less of education and are trained to perform simple tasks like checking a person's pulse. They are not trained and or licensed to assess medical conditions. Dozens of examples involved SHP employees refusing to send people to a hospital who were in crisis, catatonic, or refusing to eat or drink.

107.    SHP repeatedly chose to staff mental health and medical positions with low-level nursing assistants who can only perform basic tasks like taking vital signs, but who cannot diagnose or assess medical conditions. Medical doctors and advanced-level nurses frequently merely consulted over the phone instead of making in-person visits and were available for only a few hours per week. SHP also restricted the type of medicines it would provide to people in jail, causing problems for jailers and especially detainees. Plaintiffs provide some examples in this complaint but do not purport to include all examples of suffering and death on SHP's watch.

108.    The County was aware of or charged with knowledge of the Marshall Project report.  The County also knew about or was charged with knowledge of numerous lawsuits against SHP, only some of which are listed in this table:

| No. | Case Details |
|-----|--------------|
| 1. | **Approximate Date Filed:** 01/03/2003<br>**Jurisdiction/Court:** N.D. Alabama<br>**Case Name:** Swann v. Southern Health Partners, Inc., et al.<br>**Summary:** Merri Elizabeth Passmore died from an untreated infection after SHP staff at Blount County Jail allegedly ignored her inability to urinate, delayed medical care despite test results, and failed to provide adequate treatment, leading to a coma and death on January 25, 2001. |

| 2. | **Approximate Date Filed:** 03/15/2011<br>**Jurisdiction/Court:** W.D. Kentucky (Owensboro Division)<br>**Case Name:** Jimenez & Butler, Co-Administrators of the Estate of Tyler Butler v. Hopkins County, Southern Health Partners, et al.<br>**Summary:** Tyler Butler, who suffered from MRSA, rheumatoid arthritis, and hypertension, was placed on a detox protocol without a doctor's exam, denied meaningful treatment despite severe distress, seizures, and inability to walk, and died in jail without ever being seen by a physician. |
|---|---|
| 3. | **Approximate Date Filed:** 01/22/2013<br>**Jurisdiction/Court:** W.D. Kentucky<br>**Case Name:** Walker v. Southern Health Partners, Inc., et al.<br>**Summary:** Joseph Shane Walker alleged SHP staff at Daviess County Detention Center ignored his repeated sick calls and prior neck fusion records, failed to treat his severe arm and shoulder numbness and pain, dismissed his concerns, and denied meaningful medical care, leaving him untreated and in ongoing pain. |
| 4. | **Approximate Date Filed:** 05/15/2013<br>**Jurisdiction/Court:** N.D. Alabama<br>**Case Name:** Estate of Dwana Richardson v. Surles et al.<br>**Summary:** Dwana Richardson died after collapsing in court from untreated breathing problems and leg pain, allegedly due to SHP's failure to provide necessary medication or hospital care at St. Clair County Jail. |
| 5. | **Approximate Date Filed:** 06/03/2013<br>**Jurisdiction/Court:** E.D. Kentucky<br>**Case Name:** Salyers v. Southern Health Partners, Inc., et al.<br>**Summary:** Michael Salyers alleged SHP and Laurel County Detention Center staff ignored his heart attack symptoms, misdiagnosing them as drug withdrawal, placing him in a 'drunk tank' instead of a hospital, which caused permanent heart damage and disability. |
| 6. | **Approximate Date Filed:** 05/07/2014<br>**Jurisdiction/Court:** E.D. Kentucky<br>**Case Name:** Rice v. Montgomery County, Kentucky, Southern Health Partners, Inc., et al.<br>**Summary:** Ronald Calvin Gaunce died from untreated drug withdrawal at Montgomery County Regional Jail after SHP staff allegedly stopped his prescribed narcotics, failed to monitor his seizures and worsening condition, and delayed care until he collapsed and died from respiratory failure and blood clots. |
| 7. | **Approximate Date Filed:** 01/27/2017<br>**Jurisdiction/Court:** M.D. Tennessee<br>**Case Name:** Potter v. Troutt, Southern Healthcare Partners<br>**Summary:** Adam Potter alleged SHP staff ignored his medical needs after a glass injury to his eye at Sumner County Jail, leading to permanent vision loss. |

| 8. | **Approximate Date Filed:** 06/21/2018<br>**Jurisdiction/Court:** E.D. Kentucky<br>**Case Name:** Rowland v. Franklin County, Kentucky, Southern Health Partners, Inc., et al.<br>**Summary:** Kimissa Rowland alleged SHP and jail staff at Franklin County Regional Jail ignored her worsening ulcerative colitis, causing severe bleeding, dehydration, and hospitalization for 2½ weeks, leaving her with chronic stomach pain and permanent injury. |
|---|---|
| 9. | **Approximate Date Filed:** 07/06/2018<br>**Jurisdiction/Court:** M.D. Alabama<br>**Case Name:** Bradley v. Southern Health Partners, Inc. et al.<br>**Summary:** Stacey R. Bradley Jr. alleged SHP and jail staff committed malpractice at Randolph County Jail by giving him medication despite known allergies, causing an allergic reaction and neglect of needed care. |
| 10. | **Approximate Date Filed:** 05/22/2019<br>**Jurisdiction/Court:** M.D. Tennessee<br>**Case Name:** Torrens v. Jacks, Davis, Southern Health Partners, et al.<br>**Summary:** Douglas Torrens alleged SHP and Humphreys County Jail staff ignored his serious pain and mobility issues affecting his arm, wrist, and hand. He was denied prescribed medical treatment, and failed to provide adequate care despite repeated requests, causing permanent injury. |
| 11. | **Approximate Date Filed:** 05/28/2019<br>**Jurisdiction/Court:** E.D. Tennessee<br>**Case Name:** Jones v. Southern Healthcare Providers, et al.<br>**Summary:** Kevin T. Jones alleged SHP staff at Blount County Adult Detention Center denied him needed medical care, retaliated against him, and improperly administered medications, worsening his disability and pain. |
| 12. | **Approximate Date Filed:** 07/08/2019<br>**Jurisdiction/Court:** E.D. Texas (Tyler Division)<br>**Case Name:** Andy Howard Morrison v. Smith County Jail Staff, Southern Health Partners Staff, Sheriff Larry R. Smith, and Smith County Commissioners<br>**Summary:** Morrison, a disabled inmate, alleged that SHP staff and Smith County officials failed to provide wheelchair-accessible accommodations, denied him prescribed medications for diabetes, neuropathy, kidney issues, and tremors, ignored sick call requests, failed to supply daily catheters, causing urinary and kidney infections, and forced him to use unsafe shower conditions that led to falls and injuries. |
| 13. | **Approximate Date Filed:** 07/16/2019<br>**Jurisdiction/Court:** E.D. Kentucky<br>**Case Name:** Glass v. Franklin County, Southern Health Partners, Inc. et al.<br>**Summary:** Dylan Harrison Stratton died from untreated benzodiazepine withdrawal at Franklin County Jail after SHP and jail staff allegedly ignored his severe psychosis, seizures, and dehydration, despite repeated warnings and court concerns. |

| 14. | **Approximate Date Filed:** 01/02/2020 **Jurisdiction/Court:** E.D. Kentucky (Southern Division – Pikeville) **Case Name:** Jordan Conn v. Pike County, Kentucky; Brian Morris, Jailer; Unknown Nurses; and Unknown Jail Employees **Summary:** Jordan Conn, a pretrial detainee, suffered severe abdominal pain from appendicitis/diverticulitis starting Sept. 28, 2019. Despite repeated complaints to jail nurses and staff and calls from his family, he was denied care for two and a half days until Sept. 30, 2019; he then required emergency surgery, including an appendectomy and repair of a perforated bowel, and now must use a colostomy bag. |
|---|---|
| 15. | **Approximate Date Filed:** 01/08/2020 **Jurisdiction/Court:** N.D. Texas (Dallas Division) **Case Name:** Rodriguez v. Southern Health Partners, Inc., et al. **Summary:** Irene Rodriguez alleged SHP and jail staff at Navarro County Jail failed to provide prenatal care despite obvious signs of premature labor, forcing her to give birth to twins A.R. and B.R. in her jail cell, who both suffered catastrophic lifelong injuries including cerebral palsy, renal failure, respiratory failure, and other extremely serious health issues, both short/long term. . |
| 16. | **Approximate Date Filed:** 05/12/2020 **Jurisdiction/Court:** E.D. Texas (Lufkin Division) **Case Name:** Louvinia Lambert, as next friend to D.R., a minor, and Verline Hartman v. Angelina County, Texas, and Southern Health Partners, Inc. **Summary:** Janet Hartman, age 44, repeatedly reported severe illness while detained at Angelina County Jail, but SHP medical staff ignored her worsening symptoms for weeks, dismissing her as faking; she was finally taken to the hospital in severe respiratory distress and died May 13, 2018 from pneumonia. |
| 17. | **Approximate Date Filed:** 06/03/2020 **Jurisdiction/Court:** N.C. Super. Ct. (Beaufort Cnty.) **Case Name:** Anderson v. Southern Health Partners, Inc. et al. **Summary:** Cory Anderson died from severe pneumonia and sepsis after SHP allegedly ignored his high blood pressure, flu-like symptoms, and repeated pleas for care at Beaufort County Jail. |
| 18. | **Approximate Date Filed:** 07/17/2020 **Jurisdiction/Court:** E.D. Kentucky (Covington Division) **Case Name:** Estate of Bradley Grote v. Kenton County, Kentucky; Kenton County Fiscal Court; Jailer Terry Carl; Deputies; Caitlin Brand; Southern Health Partners, Inc.; and others **Summary:** Bradley Grote, detained at Kenton County Detention Center on July 19, 2019, showed extreme distress and symptoms of methamphetamine overdose. Despite obvious medical needs, SHP nurse Caitlin Brand, other SHP staff, and jail deputies failed to call 911 or provide emergency care; he suffered seizures, was left untreated in a cell, and died July 22, 2019 from complications of overdose and neglect. |

| 19. | **Approximate Date Filed:** 08/10/2020<br>**Jurisdiction/Court:** E.D. North Carolina<br>**Case Name:** Charles Phelps v. County of Franklin, Kent Winstead, and Southern Health Partners, Inc.<br>**Summary:** Charles Phelps, detained at Franklin County Detention Center, had a history of heart disease and was prescribed daily aspirin, but SHP staff repeatedly denied him aspirin during his three-week confinement; on August 9, 2017, he suffered a heart attack, allegedly caused by SHP and jail officials' deliberate indifference to his serious medical needs. |
|---|---|
| 20. | **Approximate Date Filed:** 09/22/2020<br>**Jurisdiction/Court:** D. South Carolina<br>**Case Name:** Stuart and Nora Witten, as Guardians and Parents of Rocco Recchia v. Southern Health Partners, Inc.<br>**Summary:** Rocco Recchia, suffering a severe psychotic episode, was arrested on April 22, 2017, and held at Pickens County Jail without medical treatment for days; despite doctor's orders, SHP staff failed to provide necessary psychiatric care or hospitalization until April 28, 2017, by which time Recchia had suffered serious psychiatric harm and required nine days of inpatient treatment. |
| 21. | **Approximate Date Filed:** 01/23/2021<br>**Jurisdiction/Court:** E.D. Kentucky (Covington Division)<br>**Case Name:** Thomas v. Southern Health Partners, Inc., et al.<br>**Summary:** Georgia Thomas alleged SHP and Kenton County Detention Center staff ignored her repeated complaints of numbness, pain, and inability to walk following a fall, failed to review records or escalate care, leaving her untreated until hospitalization revealed a spinal epidural abscess and cord compression that caused permanent paraplegia. |
| 22. | **Approximate Date Filed:** 03/22/2021<br>**Jurisdiction/Court:** M.D. North Carolina<br>**Case Name:** Christopher Neal v. Alamance County Detention Center, John Doe Captain, Jane Doe Health Services Administrator, John Doe Correctional Officer, and Southern Health Partners, Inc.<br>**Summary:** Christopher Neal, a pretrial detainee at Alamance County Detention Center, broke his hand on June 21, 2019. Despite obvious swelling and pain, SHP staff and jail officials denied him hospital care, delayed x-rays for days, and left his fractured hand untreated until after his transfer to prison, causing permanent injury, disability, and severe pain. |
| 23. | **Approximate Date Filed:** 05/26/2021<br>**Jurisdiction/Court:** W.D. Texas<br>**Case Name:** Morris v. Southern Healthcare Partners, McClennan County, Texas<br>**Summary:** Larry Wayne Morris alleged SHP staff at Hill County Jail ignored his repeated requests for medication and blood pressure checks, leaving him untreated until his blood pressure became dangerously high and required emergency hospitalization, causing serious health risks. |

| 24. | **Approximate Date Filed:** 07/06/2021 |
|---|---|
| | **Jurisdiction/Court:** W.D. Kentucky (Bowling Green Division) |
| | **Case Name:** Christopher L. Prince and Betsabe Puga, Guardian of C.W.P.P., a minor v. Warren County, Kentucky; Stephen Harmon; Deputy Casey; John and Jane Doe Deputies; Southern Health Partners, Inc.; Barry Dority, APRN; Shelly Weaver, LPN; and Elysia Foley, LPN |
| | **Summary:** Christopher Prince, age 49, a pretrial detainee at Warren County Regional Jail, exhibited classic stroke symptoms on April 19, 2021, but SHP staff and jail officials delayed treatment for over 24 hours, mismanaged his care, and failed to send him to a nearby hospital until it was too late; he suffered a massive stroke, leaving him permanently disabled, unable to work or communicate effectively, and unable to care for his five-year-old son. |
| 25. | **Approximate Date Filed:** 07/07/2021 |
| | **Jurisdiction/Court:** W.D. Arkansas (Texarkana Division) |
| | **Case Name:** LaShundra Bradley, Individually and as Special Administrator of the Estate of Anthony Corey Bradley v. Miller County, Arkansas; City of Texarkana, Arkansas; Southern Health Partners, Inc.; and multiple individuals |
| | **Summary:** Anthony Corey Bradley, age 47, was jailed in Miller County on July 6, 2018 with hypertension and acid reflux; SHP nurses failed to provide his prescribed medications, placed him in maximum security as punishment, ignored his worsening symptoms, and despite family delivering his medications, never administered them; he vomited, deteriorated for hours without monitoring, and died on July 8, 2018 from acute peritonitis due to a ruptured duodenal ulcer. |
| 26. | **Approximate Date Filed:** 08/18/2021 |
| | **Jurisdiction/Court:** M.D. North Carolina |
| | **Case Name:** Harrington v. Southern Health Partners, Inc. et al. |
| | **Summary:** Wesley Randolph Hunter died after SHP and staff allegedly ignored his serious medical needs at Cabarrus County Jail, with his estate claiming deliberate indifference and constitutional violations. |
| 27. | **Approximate Date Filed:** 10/25/2021 |
| | **Jurisdiction/Court:** W.D. Pennsylvania |
| | **Case Name:** Mitchell v. Southern Health Partners, Inc. et al. |
| | **Summary:** David B. Mitchell alleged SHP and Beaver County Jail staff ignored his repeated sick call requests for a worsening dental abscess, delaying hospital transfer until he developed Ludwig's Angina that required extensive surgery and caused permanent injuries. |
| 28. | **Approximate Date Filed:** 01/10/2022 |
| | **Jurisdiction/Court:** M.D.N.C. **Case Name:** Lynn Cowan, Administrator of the Estate of William Lawrence, deceased v. Southern Health Partners, Inc. |
| | **Summary:** William Lawrence Cowan, 29, entered the Alamance County Detention Center in 2019 in an acute psychotic state. Despite his known mental health history, Southern Health Partners staff reduced his medications, failed to provide appropriate follow-up care or suicide precautions, and he was later discovered deceased in his cell from suicide by hanging. |

| 29. | **Approximate Date Filed:** 02/09/2022<br>**Jurisdiction/Court:** Campbell County Circuit Court Kentucky<br>**Case Name:** Arlinghaus v. Campbell County and Southern Health Partners, Inc.<br>**Summary:** Jessica Vanover died from untreated pneumonia after SHP allegedly failed to provide her with necessary antibiotics and adequate medical care while detained at Campbell County Jail. |
|---|---|
| 30. | **Approximate Date Filed:** 02/17/2022<br>**Jurisdiction/Court:** N.D. Texas<br>**Case Name:** Alexander v. Southern Health Partners, Inc. et al.<br>**Summary:** Ronnie Alexander alleged SHP staff ignored his medical needs while he was held in inhumane solitary confinement, leading to dehydration, infection, and lasting PTSD. |
| 31. | **Approximate Date Filed:** 03/07/2022<br>**Jurisdiction/Court:** M.D. North Carolina<br>**Case Name:** Carrie Hussey v. Tracy Carter, Lee County, Jane Doe (SHP Nurse), and others<br>**Summary:** Carrie Hussey, while serving a sentence in Lee County Jail, developed tuberculosis with severe chest pain, night sweats, and fever. Despite repeated requests and an x-ray showing lung collapse and fluid buildup, SHP nurse and jail staff delayed hospital transfer for weeks, mocked her as faking, and denied medication doses; she was hospitalized only after family threats, diagnosed with TB and sepsis, required prolonged treatment, and suffered permanent lung damage. |
| 32. | **Approximate Date Filed:** 05/02/2022<br>**Jurisdiction/Court:** D. South Carolina (Aiken Division)<br>**Case Name:** Rhoads v. Southern Health Partners, Inc., et al.<br>**Summary:** Cassiopia Rhoads alleged SHP and jail staff at Aiken County Detention Center ignored repeated complaints of swelling, headaches, fainting, and infection on the side of her head in May–June 2019, delaying hospital transfer until she developed osteomyelitis, epidural abscess, and sepsis requiring a craniectomy and causing permanent injury. |
| 33. | **Approximate Date Filed:** 05/16/2022<br>**Jurisdiction/Court:** D.S.C.<br>**Case Name:** Johnson v. Oconee County Sheriff's Department, Southern HealthCare Partners, et al.<br>**Summary:** Clinton Douglas Johnson alleged SHP and jail staff denied him medical care and subjected him to unsafe conditions at Oconee County Detention Center, causing spinal disease, infections, nerve damage, and PTSD. |

| 34. | **Approximate Date Filed:** 06/29/2022<br>**Jurisdiction/Court:** E.D.N.C., W. Div.<br>**Case Name:** Nordan v. Carson, Bizzell, Johnston County & Southern Health Partners, Inc.<br>**Summary:** Eric Avila Cruz, age 23, alleged that Johnston County Jail and SHP staff ignored his end-stage renal failure, withheld life-sustaining dialysis for ten days, failed to provide prescribed medications and antibiotics, disregarded repeated pleas from him, his family, and medical providers, and left him to deteriorate in obvious pain until he collapsed and died in custody. |
|---|---|
| 35. | **Approximate Date Filed:** 11/02/2022<br>**Jurisdiction/Court:** E.D. Kentucky (London Division)<br>**Case Name:** Estate of Aaron K. Burnette, et al. v. Whitley County, Kentucky; Brian Lawson; Steve Claxton; and Unknown Defendants<br>**Summary:** Aaron K. Burnette, jailed on a drug charge, exhibited delirium and distress at Whitley County Detention Center on September 7–8, 2022. Despite obvious medical crisis, staff failed to obtain treatment, placed him in isolation, and ignored his worsening condition; he collapsed unresponsive during a virtual court appearance, received only belated care, and died on September 8, 2022, from untreated medical distress. |
| 36. | **Approximate Date Filed:** 11/07/2022<br>**Jurisdiction/Court:** E.D. Texas (Tyler Division)<br>**Case Name:** Jack Cody Raburn, on behalf of the inmates housed at Henderson County Jail v. Henderson County Sheriff's Office; Sheriff Botie Hillhouse; Chief Kevin Naliboff; Assistant Chief; Nurse Amanda; Mental Health Mr. Jefferies; Dr. Mongare<br>**Summary:** Raburn alleged that SHP medical staff and Henderson County officials failed to provide necessary medical and mental health care, ignored repeated sick calls and serious conditions including infections and neurological issues, and subjected inmates to excessive pain and unconstitutional conditions of confinement. |
| 37. | **Approximate Date Filed:** 02/25/2023<br>**Jurisdiction/Court:** S.D. Ohio (Western Division)<br>**Case Name:** Mark Lovelol v. Clermont County Sheriff's Office, Clermont County, Sheriff Robert Leahy, Joseph Bailey, Samantha Irwin, Eric Mullenix, Gregory Paff, Dylan Pemberton, Alex Tincher, Terra Shouse, and Southern Health Partners, Inc.<br>**Summary:** Mark Lovelol alleged that Clermont County officers brutally beat him while detained, causing a spleen laceration, rib fractures, and collapsed lung, and that SHP nurse Samantha Irwin and staff failed to provide adequate medical care, leaving him untreated for hours and worsening his injuries. |

| 38. | **Approximate Date Filed:** 03/08/2023 |
|---|---|
| | **Jurisdiction/Court:** E.D. Kentucky (Ashland Division) |
| | **Case Name:** Justin Davis v. Southern Health Partners, Inc.; Judy Mabry, RN; Latrisha Ferguson, LPN; Norah McGlone, LPN; Karen Bennett Baker, ARNP; and Boyd County officials |
| | **Summary:** Justin Davis, a pretrial detainee with a severe left hand gunshot injury, alleged SHP nurses and Boyd County jail staff repeatedly denied him access to his surgeon and critical medical care for nearly a year, causing his hand to blacken, deteriorate, and lose function; he ultimately required multiple surgeries, including amputation of his left long finger, and faces permanent disability. |
| 39. | **Approximate Date Filed:** 04/21/2023 |
| | **Jurisdiction/Court:** N.D. Georgia (Atlanta Division) |
| | **Case Name:** Natalia and Maria Sutherland, as Surviving Children of Andrew Reed Sutherland v. Butts County, Georgia, et al., including Southern Health Partners, Inc. |
| | **Summary:** Andrew Reed Sutherland, age 57, with bipolar disorder and prior suicide attempts, was jailed in Butts County in April 2021 where SHP nurses and staff allegedly failed to obtain medication, provide medical/mental health evaluation, or conduct suicide watch checks; he repeatedly injured himself, suffered a subdural hemorrhage, and died on May 10, 2021. |
| 40. | **Approximate Date Filed:** 04/30/2023 |
| | **Jurisdiction/Court:** E.D. Texas |
| | **Case Name:** Cabrera v. Southern Health Partners, Inc. et al. |
| | **Summary:** Wendy Cabrera died from alcohol withdrawal after SHP allegedly failed to monitor her condition or transfer her to a hospital at Angelina County Jail, despite her known history of alcoholism and seizures. |
| 41. | **Approximate Date Filed:** 06/30/2023 |
| | **Jurisdiction/Court:** E.D. Kentucky (Lexington Division) |
| | **Case Name:** Michael Conrad Reid v. Scott County Detention Center; Jailer Derran Broyles; Carla Cannon; Elijah J. Griffin; Jordan Simpson; Nicholas Rathbone; Derrick Davis; Andrea Randall; Johnny R. Anders; John C. Little Jr.; Southern Health Partners, Inc.; Latosha Jordan Tucker; and Edna Harrison |
| | **Summary:** Michael Conrad Reid, a pretrial detainee at Scott County Detention Center, developed excruciating groin and testicular pain beginning June 30, 2022. Despite swollen testicles the size of softballs and alarming vitals, SHP nurses and jail staff repeatedly dismissed his condition as a hernia, denied him hospital care, and threatened him; only after he collapsed was he taken to a hospital, where he was diagnosed with a massive infection, sepsis, and hydrocele, requiring weeks of hospitalization. |

| 42. | **Approximate Date Filed:** 08/03/2023 |
| | **Jurisdiction/Court:** N.D. Texas (Dallas Division) |
| | **Case Name:** Mary Albritton, as next friend of Cody Albritton v. Henderson County, Texas; Philip R. Taft, Psy.D; Philip R. Taft Psy.D & Associates, PLLC; and Southern Health Partners, Inc. |
| | **Summary:** Cody Albritton—who has intellectual disability (IQ ~35), schizo-affective disorder, OCD, and chronic systolic heart failure—alleged SHP and jail staff withheld all prescribed medications, failed to monitor him, and left him in a 'violent cell' without water, toilet, bedding, or sleep, causing severe psychological trauma and health risks (no death alleged). |
| 43. | **Approximate Date Filed:** 10/24/2023 |
| | **Jurisdiction/Court:** E.D. Kentucky (Southern Division, London) |
| | **Case Name:** Tammy Webb, as Administratrix of the Estate of Terri Beth Mays v. Whitley County, et al., including Southern Health Partners |
| | **Summary:** Terri Beth Mays, age 34, detained at Whitley County Detention Center with a known seizure disorder, suffered repeated seizures in late October–early November 2021. Despite SHP nurses documenting seizure activity and her prior hospitalizations, SHP staff and jailers failed to provide medication, monitoring, or emergency care. She collapsed in her isolation cell on November 3, 2021, and was left deteriorating until found unresponsive; she died on November 4, 2021, from untreated seizures and neglect. |
| 44. | **Approximate Date Filed:** 11/06/2023 |
| | **Jurisdiction/Court:** E.D. Kentucky (Lexington Division) |
| | **Case Name:** Bonnie DeHart, Administratrix of the Estate of Kevin Allen Hall v. Montgomery County Fiscal Court, Ian Roberts, Southern Health Partners, and others |
| | **Summary:** Kevin Hall, age not specified, told SHP staff and jailers on June 15, 2022 that he was having a heart attack, but instead of medical care he was repeatedly restrained in the WRAP device for nearly 15 of his final 24 hours. Despite pleas to family and an ambulance being called, SHP nurse and jail staff ignored him, fabricated logs, and denied treatment; he was found unresponsive June 16, 2022 and died, alleged to be from untreated cardiac distress and excessive force. |
| 45. | **Approximate Date Filed:** 11/30/2023 |
| | **Jurisdiction/Court:** D.S.C. (Beaufort Division) |
| | **Case Name:** Emma Ortega Guerra and Rogelio Ortega Guerra, as Personal Representatives of the Estate of Lourdes M. Guerra Mendez v. Jasper County, Jasper County Detention Center, and John Does 1–10 |
| | **Summary:** Lourdes M. Guerra Mendez, age not specified, was arrested on July 22, 2023 and transferred to Jasper County Detention Center, where SHP staff and jail officials allegedly failed to screen, monitor, or provide necessary medical care; she was found unresponsive and died on July 24, 2023, with her death attributed to untreated medical needs and neglect. |

| 46. | **Approximate Date Filed:** 12/15/2023 |
| | **Jurisdiction/Court:** D. South Carolina |
| | **Case Name:** Estate of Alan R. Thibodeau v. Bamberg County, South Carolina, et al. |
| | **Summary:** Alan R. Thibodeau died from untreated diabetes, withdrawal, and mental health conditions at Bamberg County Detention Center after SHP nurse Geri Gillespie allegedly failed to provide insulin, monitoring, or psychiatric care, and subjected him to excessive force, causing organ failure, septic shock, and death on July 23, 2022. |
| 47. | **Approximate Date Filed:** 12/22/2023 |
| | **Jurisdiction/Court:** N.D. Ohio (Western Division) |
| | **Case Name:** Ashley Stewart, Administrator of the Estate of Jared D. Stewart v. Corrections Center of Northwest Ohio; Corrections Commission of Northwest Ohio; CCNO Board; Executive Director Dennis Sullivan; Southern Health Partners, Inc.; Dr. Anas Alzuhaili; Health Administrator; Joelyn Etgen, NP; Angela Bruinix, RN; and John/Jane Does |
| | **Summary:** Jared Stewart, age 44, was serving a 180-day sentence at CCNO beginning July 2021 with known cardiac conditions including a pacemaker, defibrillator, and aortic valve replacement requiring blood thinners and INR monitoring. SHP staff and jail officials failed to monitor his INR, adjust medications, or ensure his cardiac devices were remotely monitored, leading to uncontrolled blood levels, fainting episodes, head injuries, and internal bleeding; he died on January 7, 2022, one day before release, from trauma caused by untreated cardiac complications and neglect. |
| 48. | **Approximate Date Filed:** 02/20/2024 |
| | **Jurisdiction/Court:** N.D. Ohio |
| | **Case Name:** Olivia Hunter v. Lucas County; Corrections Center of Northwest Ohio; CCNO Board and Commission; Southern Health Partners, Inc.; Trident Care Imaging; and others |
| | **Summary:** Olivia Hunter, a detainee at CCNO from April to May 2022, repeatedly complained of severe abdominal pain and constipation but was labeled a faker, denied proper exams, and subjected to a misread x-ray outsourced by SHP and Trident; upon release she was diagnosed with colon cancer requiring emergency surgery and a permanent colostomy bag. |
| 49. | **Approximate Date Filed:** 04/17/2024 |
| | **Jurisdiction/Court:** M.D. North Carolina |
| | **Case Name:** Melissa Efird, as Personal Representative of the Estate of Kyle Barrett Kepley v. Rockingham County Sheriff Samuel Scott Page, et al., including Southern Health Partners, Inc. |
| | **Summary:** Kyle Barrett Kepley, age 34, exhibiting psychosis, delusions, and opiate withdrawal at Rockingham County Detention Center, was denied suicide watch, mental health treatment, and adequate monitoring despite warnings and obvious risk; on May 3, 2022, he was found hanging in his cell and died by suicide. |

| 50. | **Approximate Date Filed:** 05/24/2024 |
| | **Jurisdiction/Court:** N.D. Texas (Dallas Division) |
| | **Case Name:** Adriane Olvera v. Henderson County, Texas; Philip R. Taft, Psy.D & Associates, PLLC; Kevin Jeffries; and Southern Health Partners, Inc. |
| | **Summary:** Adriane Olvera, detained in Henderson County Jail, was held in a 'violent cell' for five weeks with no toilet, bedding, or hygiene, despite being cleared from suicide watch after one week; SHP staff never checked on her, and she suffered dehydration, drug withdrawal, anemia complications, sleep deprivation, and dehumanizing treatment in violation of constitutional and medical care standards. |
| 51. | **Approximate Date Filed:** 06/03/2024 |
| | **Jurisdiction/Court:** N.D. Ohio (Western Division) |
| | **Case Name:** Cassandra Richards, Administrator of the Estate of Dakota James Embry v. Mark Wasylyshyn, Wood County Sheriff, et al., including Southern Health Partners, Inc. |
| | **Summary:** Dakota Embry, age 24, displayed erratic behavior and begged for medical help while jailed in Wood County, Ohio on June 2, 2023; despite dangerously low oxygen and signs of methamphetamine toxicity, SHP nurses and officers failed to send him to the ER, and he died that night of acute methamphetamine toxicity. |
| 52. | **Approximate Date Filed:** 06/27/2024 |
| | **Jurisdiction/Court:** S.C. Court of Common Pleas (Aiken County) |
| | **Case Name:** Jefferey Lurvern Davis, Sr., Individually and as Personal Representative of the Estate of Heather Leighann Davis Carter v. Aiken County Sheriff's Office and Southern Health Partners, Inc. |
| | **Summary:** Heather Leighann Davis Carter, age 28, with mental health concerns, was on suicide watch at Aiken County Detention Center. Despite her vulnerability and warnings, SHP staff and jail officials left her with means to harm herself; on July 29, 2021, she hanged herself in her cell and later died at a hospital, her death ruled suicide. |
| 53. | **Approximate Date Filed:** 08/06/2024 |
| | **Jurisdiction/Court:** M.D. Tennessee |
| | **Case Name:** Moulton v. Southern Health Partners, Inc., et al. |
| | **Summary:** Alyssia Moulton, a pregnant detainee, alleged SHP staff ignored withdrawal symptoms, failed to provide prenatal care, and disregarded her labor pains, forcing her to give birth alone in her jail cell toilet where baby A.M. was delivered and suffered infections, causing severe injuries to both mother and child. |
| 54. | **Approximate Date Filed:** 09/20/2024 |
| | **Jurisdiction/Court:** N.D. Texas (Dallas Division) |
| | **Case Name:** Daniel Anthony v. Henderson County, City of Malakoff, Philip R. Taft, Psy.D, Philip R. Taft Psy.D & Associates, PLLC, and Southern Health Partners, Inc. |
| | **Summary:** Daniel Anthony, who has muscular dystrophy and PTSD, alleged he was falsely arrested, pepper-sprayed, mocked, and confined for a week in the jail's filthy 'violent cell' without toilet, water, hygiene, bedding, or medication; he claimed SHP staff ignored his bleeding wounds, withheld Buspar, and failed to monitor his serious medical and mental health needs. |

| 55. | **Approximate Date Filed:** 09/23/2024 <br> **Jurisdiction/Court:** S.D. Texas (Victoria Division) <br> **Case Name:** Christopher Wennermark v. DeWitt County, Christopher Smith, William Riemenschneider, Jerry Garza, Sergeant Johnson, and Does 1–30 <br> **Summary:** Christopher Wennermark, a diabetic with neuropathy and partial blindness, developed a severe infected wound on his heel while jailed in DeWitt County. Despite visible worsening infection and repeated pleas, officials and staff failed to provide proper insulin, diabetic meals, or medical care, instead giving only athlete's foot cream; treatment was delayed for months until his release, when he was diagnosed with severe gangrene requiring surgeries and leaving him permanently impaired. |
|---|---|
| 56. | **Approximate Date Filed:** 11/13/2024 <br> **Jurisdiction/Court:** E.D. Tennessee (Greeneville Division) <br> **Case Name:** MatthewPaul Qualls v. Hawkins County, Tennessee; Sheriff Ronnie Lawson; Southern Health Partners, Inc.; and others <br> **Summary:** Matthew Qualls, age 38, was detained in Hawkins County Jail in May 2021 with a known seizure disorder and allegedly suffered repeated seizures without receiving anti-seizure medication, monitoring, or emergency care; he was found unresponsive on May 26 and died from untreated seizures. |
| 57. | **Approximate Date Filed:** 12/17/2024 <br> **Jurisdiction/Court:** E.D. North Carolina (Northern Division) <br> **Case Name:** Casey Howard Clabough v. Robert G. Jones, Robert W. Jones, Natasha Green, Nora Mansfield, and Southern Health Partners, Inc. <br> **Summary:** Casey Howard Clabough, age 48, with schizophrenia, schizoaffective disorder, and major depressive disorder, repeatedly reported psychosis, hallucinations, and suicidal ideation while at Albemarle District Jail. Despite mental health directives to remove his belongings and place him on suicide precautions, SHP nurses Green and Mansfield and jail administrators failed to act; Clabough hanged himself on January 1, 2023, and died from ligature asphyxiation. |
| 58. | **Approximate Date Filed:** 02/05/2025 <br> **Jurisdiction/Court:** D. South Carolina (Florence Division) <br> **Case Name:** Beverly M. Farmer, Special Administrator for the Estate of Stephen Paul Sprouse v. Troy Ellerbe, Cambo Streater, Chesterfield County Sheriff's Department, Chesterfield County Detention Center, Craig L. Dixon, and Southern Health Partners, Inc. <br> **Summary:** Stephen Paul Sprouse, who had a recent heart attack and stent placement, informed jail staff of his condition and provided medical documentation, but SHP and detention staff failed to provide his prescribed heart medication, mishandled pill distribution, ignored his chest pains and shortness of breath, and failed to respond properly when he collapsed; inmates had to attempt CPR and use an AED before EMS arrived, and Sprouse died from a cardiac rupture. |

| 59. | **Approximate Date Filed:** 05/12/2025<br>**Jurisdiction/Court:** E.D. Texas (Lufkin Division)<br>**Case Name:** Marcos Brown v. Angelina County, Texas; Tom Selman; S. Wilson; and Southern Health Partners, Inc.<br>**Summary:** Marcos Brown, who suffers from COPD, alleged that SHP and jail staff at Angelina County Jail failed to provide necessary breathing treatments, kept him in moldy and unsafe cells without medical supervision, and ignored his worsening respiratory condition, causing hospitalization and serious health risks. |
|---|---|
| 60. | **Approximate Date Filed:** 07/08/2025<br>**Jurisdiction/Court:** M.D. North Carolina<br>**Case Name:** Robert Lewis v. Southern Health Partners, et al.<br>**Summary:** Robert Lewis, a pretrial detainee with diabetes and acid reflux, alleged SHP and Hoke County officials denied him prescribed insulin, proper diabetic care, and GERD treatment, instead imposing a 'sliding-scale' insulin policy that failed to manage his condition, leaving him with dangerously high blood sugar, severe headaches, dizziness, blurred vision, and chest pains. |
| 61. | **Approximate Date Filed:** 07/21/2025<br>**Jurisdiction/Court:** USDC Colorado<br>**Case Name:** Estate of Daniel Foard v. Southern Health Partners, Inc. et al.<br>**Summary:** Daniel Foard died from a perforated duodenal ulcer and acute peritonitis after SHP and jail staff allegedly failed to provide timely hospital care while he was detained at La Plata County Jail |
| 62. | **Approximate Date Filed:** 07/22/2025<br>**Jurisdiction/Court:** D. South Carolina (Florence Division)<br>**Case Name:** Estate of Stephen Paul Sprouse v. Southern Health Partners, Inc.<br>**Summary:** Stephen Paul Sprouse, who had recently suffered a heart attack and stent placement, allegedly died from a cardiac rupture at Chesterfield County Detention Center after SHP staff failed to provide prescribed medications, ignored his chest pain, and delayed emergency response, forcing inmates to attempt CPR and AED use. |
| 63. | **Approximate Date Filed:**08/11/2025<br>**Jurisdiction/Court:** N.D. Ga.<br>**Case Name:** Gist Huskins was housed at the Gordon County Jail in 2021 when a dentist asked to see his partial plate. After Huskins handed it over, the dentist broke it. The dentist and Southern Health Partners (SHP) accepted responsibility but failed to provide a functional replacement before Huskins was transferred to prison. SHP has since failed to replace the plate, causing ongoing pain and difficulty chewing. |
| 64. | **Approximate Date Filed:** 08/20/2025<br>**Jurisdiction/Court:** W.D. Arkansas (Texarkana Division)<br>**Case Name:** Terry v. Walker, Southern Health Partners, et al.<br>**Summary:** Troy Carlton Terry alleged SHP and Miller County Jail staff ignored his serious medical needs, including high blood pressure and severe pain, delayed or denied proper treatment and surgeries, failed to make needed medical appointments, and punished him for complaining, leaving him in ongoing pain and requiring additional surgeries. |

| 65. | **Approximate Date Filed:**09/30/2025 |
| | **Jurisdiction/Court:** U.S. Dist. Ct., M.D. Ga., Valdosta Div. |
| | **Case Name:** Jeanne Wood, as Mother of Gayle Halee Gieger, Deceased v. Southern Health Partners, inc. |
| | **Summary:** Jeanne Wood alleges Southern Health Partners and Tift County jail staff acted with deliberate indifference by ignoring Gayle Halee Gieger's severe mental health needs, failing to provide proper treatment and supervision, and allowing conditions that led to her suicide by strangulation with shackles, resulting in her death and constitutional violations. |
| 66. | **Approximate Date Filed:**10/03/2025 |
| | **Jurisdiction/Court:** U.S. Dist. Ct., M.D. Ga., Macon Div. |
| | **Case Name:** Matt Maloney and Ann Maloney, as Surviving Parents of Diana Maloney, Deceased v. Southern Health Partners, Inc., et al. |
| | **Summary:** Matt and Ann Maloney allege Southern Health Partners and Wilkinson County Jail staff acted with deliberate indifference by failing to treat Diana Maloney's severe opioid withdrawal, disregarding medical orders, and not placing her on observation watch. She was found dead in her cell on February 5, 2024, from suicide by hanging, which Plaintiffs claim was the direct result of inadequate medical care and constitutional violations. |
| 67. | **Approximate Date Filed:**10/17/2025 |
| | **Jurisdiction/Court:** N.D. Ga. |
| | **Case Name:** Huskins, Gist v. SHP |
| | **Summary:** Gist Huskins, a detainee at Gordon County Jail, alleged that during a dental visit, the jail's dentist broke his partial plate while preparing to extract a tooth. Although the dentist accepted responsibility and assured Huskins that the plate would be repaired or replaced, no replacement or repair has occurred, leaving him without a functional plate. |
| 68. | **Approximate Date Filed:**10/27/2025 |
| | **Jurisdiction/Court:** D.S.C., Aiken Div. |
| | **Case Name:** Kelly, Brittany v. SHP |
| | **Summary:** Robert B. Burroughs, IV, a detainee at Aiken County Detention Center, alleged that staff ignored his insulin-dependent diabetes and withdrawal symptoms, failing to provide prescribed insulin or proper monitoring. As a result of this deliberate indifference, Burroughs' condition worsened, and he died at Aiken Regional Medical Center. |
| 69. | **Approximate Date Filed:**10/28/2025 |
| | **Jurisdiction/Court:** M.D. Ala. |
| | **Case Name:** Moore v. SHP |
| | **Summary:** Joe Moore, a Clanton, Alabama resident, alleged that the Chilton County SWAT Team raided his home without a warrant, fired multiple CS gas canisters, and used excessive force, injuring him. After his arrest, Moore claimed jail staff beat him, denied medical care for chemical exposure and heart symptoms, and restrained him for hours as punishment, with a nurse failing to intervene. |

| 70. | **Approximate Date Filed:** 11/24/2025<br>**Jurisdiction/Court:** M.D. Ala.<br>**Case Name:** Jones v. SHP<br>**Summary:** Jessica Jordan, a Randolph County Jail inmate, alleged that staff ignored her report of ingesting eight grams of meth, placed her in a safety chair, and failed to provide timely medical care. When she became unresponsive, staff attempted CPR and used an AED before paramedics arrived, and experts concluded that the delay and inadequate protocols constituted deliberate indifference contributing to her death. |
|-----|---|

109.    Despite Trey's death, the County's knowledge or constructive knowledge of lawsuits filed against SHP preceding Trey's death, and knowledge or constructive knowledge of lawsuits filed against SHP after Trey's death, DeWitt County continued it contractual relationship with SHP.  The County's decision to do so affirmed and confirmed its approval of SHP policies, practices, and customs.

### 3.    Nondelegable Duties and Respondeat Superior

110.    The County owed nondelegable constitutional duties to the decedent. Therefore, the County is liable for the policies, practices, and customs of SHP, as well as the actions and inactions of SHP employees that caused, were proximate causes of, or were producing causes of damages (including suffering and death) referenced in this pleading.

111.    Moreover, in addition to liability for its policies, practices, and customs resulting in damages (including death) referenced in this pleading, SHP is also vicariously liable under the doctrine of respondeat superior for the actions or inactions of its employees and agents. Plaintiffs make this allegation pursuant to existing law or as a good faith argument for the extension or confirmation of existing law. SHP, as a large, private, for-profit entity, does not receive the same liability protection as would a county or other governmental body. SHP cannot claim any type of governmental immunity.  Likewise, under Fifth Circuit authority, even its employees cannot claim qualified immunity in any case in which they are

sued. No SHP employees are Defendants in this case, and Plaintiffs have no intent to add any natural persons as Defendants. There are a number of factors supporting allegations in this section of this pleading, including:

- SHP was systematically organized to perform the major administrative task of providing medical and mental healthcare in jails inside and outside Texas.

- SHP was at the time of incidents relevant to this case in the business of administering correctional healthcare services.

- SHP has grossed millions of dollars each year from its contracts with Texas and other jails.

- SHP was at the time of decedent's death a systematically organized entity with limited direct supervision by the County, undertaking its task for profit and while in competition with other for-profit firms providing similar services.

- Market forces existed at all relevant times that were likely to provide SHP with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or non-arduous employee job performance.

- Ordinary marketplace pressures were present at all relevant times during SHP's provision of services to the County.

- SHP had a multi-year contract, so that its performance was disciplined by pressure from potentially competing firms that could try to take its place in providing services to the County.

- SHP was required by contract to purchase substantial insurance coverage to compensate victims of civil rights torts.

- SHP maintained a risk management and legal defense team ready to aggressively address each claim or lawsuit against it.

- SHP employed medical professionals who faced potential liability both for choosing a course of treatment that was too aggressive and for choosing a course not aggressive enough, rather than employing jailers who rarely face liability for the adequacy of provided medical care.

- SHP's primary function at the jail was providing healthcare and mental healthcare services.

- SHP employees are overseen by SHP.

- SHP, as opposed to the County, took the lead in developing relevant policy regarding healthcare and mental healthcare provision in the County jail.

- SHP developed and maintained the County jail's healthcare policies and procedures manual.

- The County could not fire or discipline SHP's employees.

- SHP employees had discretion to take certain actions that County employees lacked the authority to do.

- SHP employees did not have a broad range of duties other than providing healthcare and/or mental healthcare.

- SHP had substantial latitude to ensure that its employees were adequately motivated (such as through employer indemnification, increased benefits, and higher pay).

- SHP's employees were "at will" employees and could be discharged at any time without cause.

- SHP determined its employees' wages, conditions of employment, and availability of benefits.

- SHP marketed its ability to attract qualified people to public service as an aspect of its sales pitch to the County and other governmental clients.

- SHP and its employees knew that they could be subject to liability without the benefit of qualified immunity. Even so, SHP was able to attract qualified employees.

- SHP contracted to indemnify the County for liability caused by SHP or its agents, employees, or contractors.

    4.    Defendants' Policies, Practices, and Customs

112.    Beneath this heading, Plaintiffs list County and SHP policies, practices, and customs that Plaintiffs allege, upon information and belief, caused, proximately caused, were producing causes of, or were moving forces behind all damages referenced in this pleading, including the decedent's death. Thus, the County and SHP are liable for all such damages.

These policies, practices, and customs worked individually, or in the alternative together, to cause the decedent's death and all other damages asserted in this pleading. There was no legitimate governmental objective in establishing or allowing these policies, practices, and/or customs. Plaintiffs plead conditions of confinement arising from policies, practices, and customs. Deliberate indifference is not an element of conditions of confinement claims. In the alternative, Plaintiffs plead episodic acts or omissions arising from policies, practices, and customs. Plaintiffs also plead that relevant actors were both deliberately indifferent and objectively unreasonable, which is relevant to the extent the Court determines that any of Plaintiffs' claims are based on episodic acts or omissions. Currently in the Fifth Circuit, courts apply the deliberate indifference standard to episodic acts or omissions claims. Plaintiffs assert that the standard should not be deliberate indifference but instead should be objective unreasonableness based on controlling United States Supreme Court precedent. Regardless of which standard applies, Plaintiffs ask the Court to apply the correct law to the facts pled, as required by United States Supreme Court precedent.

113.     Courts have recognized that it is exceedingly rare for a plaintiff to have access to or personal knowledge of specific details regarding the existence or absence of a defendant's internal policies or training procedures before discovery. Thus, at the pleading stage, a plaintiff is merely required to put a governmental entity on fair notice of the grounds for which it is being sued. Federal courts must rely on summary judgment to weed out unmeritorious claims. Plaintiffs thus plead the following policies, practices, and customs, individually, collectively, and alternatively, which give rise to conditions of confinement, or in the alternative episodic acts or omissions, and are supported by all facts alleged in this complaint and reasonable inferences therefrom:

**Failing to Provide Emergency or Necessary Medical Care**

- DeWitt County contracted with, retained, and continued its relationship with SHP despite the existence of public records and news media coverage demonstrating that SHP was not competent or that SHP frequently violated jail detainees' constitutional rights. Some such information is cited in this complaint. In the alternative, DeWitt County chose to do no investigation regarding SHP competency or reputation. DeWitt County is nonetheless still liable, as it is charged with constructive knowledge of what it could have learned.

- DeWitt County and SHP or both did not have on staff at the jail a full-time, appropriately licensed and experienced medical professional, such as a physician's assistant, nurse practitioner, or physician.

- DeWitt County or SHP or both would take vital signs of detainees as "cover" in the event detainees suffered a serious adverse medical event, knowing that the taking of vital signs, potentially by low-level medical personnel, is not appropriate for all medical conditions and will not disclose and/or inform diagnosis of serious medical conditions.

- DeWitt County or SHP or both failed to provide or delayed providing medical treatment to detainees.

- DeWitt County or SHP or both, while knowing that detainees needed immediate emergency medical care, would continue incarcerating such detainees in lieu of obtaining needed care.

- DeWitt County or SHP or both failed to act to address observed serious health issues while monitoring detainees. This was in part an effort to save costs.

- DeWitt County or SHP or both would not respond, or respond appropriately, when detainees suffered from serious medical issues which were visible and apparent through a video feed of a detainee's cell. In the alternative, DeWitt County or SHP or both ignored video feeds even for detainees with serious medical or mental health issues.

- To save money, DeWitt County or SHP or both would refuse to transport detainees who vitally needed emergency medical care to a local emergency room.

- DeWitt County or SHP or both would only contact emergency medical services or transport a person to a local hospital if the person appeared to be near death or had become nonresponsive.

- DeWitt County would not allow medical personnel at a hospital to remove an arrestee from the back of a patrol vehicle to conduct an appropriate medical examination.

- DeWitt County or SHP or both failed to implement and train regarding an appropriate detox protocol for detainees but instead applied in substance an impermissible "sleep it off" policy for detainees detoxing from drugs or alcohol.

- DeWitt County or SHP or both would wait for a patrol officer to leave patrol and travel to the jail to provide CPR in the event of a detainee medical emergency.

**Monitoring**

- DeWitt County or SHP or both failed to monitor, adequately monitor, or effectively monitor detainees.

- DeWitt County or SHP or both would improperly rely on a camera feed to observe a detainee in a cell rather than conducting in-person substantive assessments.

- DeWitt County or SHP or both would just attempt to determine whether a detainee in a cell was breathing rather than monitoring and assessing detainees for their entire medical status or condition.

- DeWitt County or SHP or both would conduct cell checks in a perfunctory manner, the person conducting the "check" not even looking into cells and instead just assuring that he or she scanned a wand to electronically record the "check."

**Communication**

- DeWitt County or SHP or both did not appropriately communicate about detainees' serious medical needs when SHP personnel were not on duty at the jail.

**Staffing**

- The DeWitt County jail was short-staffed on weekends, not having appropriate medical personnel on duty. In part, SHP had failed to staff the jail on weekends with even a nurse.

- DeWitt County or SHP or both failed to appropriately staff the jail with medical personnel, instead providing medical personnel who were on duty only from 8:00 a.m. to 5:00 p.m. Monday through Friday

each week.

**Training**

- DeWitt County failed to train jailers as to how to deal with seriously or chronically ill detainees.

- DeWitt County failed to train jailers as to how to deal with jail deaths or detainees who are found unresponsive in cells.

- DeWitt County failed to train jailers as to how to deal with highly intoxicated detainees or detainees who were detoxing from drugs or alcohol.

- DeWitt Couty failed to train and certify jailers in how to administer CPR.

**Other Evidence of Policies, Practices, and Customs**

- When a policymaker knows about misconduct and fails to take remedial action, such inaction can support a finding that the policymaker acquiesced in the misconduct representing official policy, practice, or custom. Based on all reasonable inferences from the alleged facts, DeWitt County and SHP or both failed to reprimand or take appropriate remedial action against employees or agents as a result of action or inaction related to the decedent's suffering and death, thus confirming that the policies, practices, and customs that led to the decedent's suffering and death were in fact *de facto* policies of DeWitt County and SHP or both.

- Consistent testimony or behavior of jail employees can also support a finding of official policy, practice, or custom. DeWitt County and SHP or both employees acted consistently in their actions or inaction related to Trey's suffering and death, thus confirming that the policies, practices, and customs that led to Trey's suffering and death were in fact *de facto* policies of DeWitt County and SHP or both.

III.    Causes of Action

A.    Remedies for Violation of Constitutional Rights

114.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective ***remedy*** for civil rights claims brought pursuant to 42 U.S.C. § 1983. Therefore, Plaintiffs seek, for causes of

action asserted in this complaint, all ***remedies and damages*** available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related or supporting case law. If the decedent had lived, he would have been entitled to bring a 42 U.S.C. § 1983 cause of action for violation of the United States Constitution and obtain ***remedies and damages*** provided by Texas and federal law. Plaintiffs incorporate this ***remedies*** section into all sections in this complaint asserting causes of action.

B.    Cause of Action Against DeWitt County and SHP Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

115.    In the alternative, without waiving any other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendants DeWitt County and SHP are liable to Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating the decedent's constitutional rights including but not necessarily limited to those to receive reasonable medical or mental healthcare, to be protected, and not to be punished as a pretrial detainee. These rights are guaranteed by at least the Fourteenth Amendment to the United States Constitution. Pretrial detainees are entitled to be protected and not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration. Regardless, Plaintiffs rely on the Court to apply the correct constitutional guarantees to the facts pled as required by United States Supreme Court precedent.

116.    The decedent received only cursory or minimal care, ineffective treatment, or

no treatment at all, for a serious medical condition of which DeWitt County and/or SHP and/or their employees and agents had knowledge, further knowing that the failure to obtain necessary emergency medical care for those medical needs would almost certainly result in serious injury or death. DeWitt County and/or SHP and/or their employees and agents were therefore deliberately indifferent to the decedent's known serious medical issues.    The County's and SHP's employees and agents acted or failed to act under color of state law at all relevant times. The County's and SHP's policies, practices, and customs were moving forces behind and caused, were producing causes of, or were proximate causes of the decedent's suffering, damages, and death, and all damages suffered by Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs.

117.    The Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege the appropriate chief policymaker at the pleadings stage. Nevertheless, out of an abundance of caution, the County sheriff was the County's relevant chief policymaker over matters at issue in this case. Moreover, in addition, and in the alternative, the County's jail administrator was the relevant chief policymaker over matters at issue in this case. Finally, in addition, and in the alternative, the County's commissioners' court was the relevant chief policymaker. Further, out of an abundance of caution, SHP's relevant chief policymaker over matters at issue in this case was or were its chief operating officer, president, vice president, physician-in-charge, chief nursing officer, site supervisor or administrator, or someone in a similar position. Moreover, policymaking authority may have been delegated to one or more persons.

118.    The County and SHP were deliberately indifferent regarding policies, practices, and customs developed or used with regard to issues addressed by allegations set

forth above, for any facts which are ultimately determined to support episodic act or omission claims, to the extent deliberate indifference is a necessary element or prerequisite to such claims at the time the Court makes that determination. Deliberate indifference is not an element of a conditions of confinement claim. The County and SHP also acted in an objectively unreasonable manner. Policies, practices, and customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of the decedent's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur. Once again, by including the "deliberate indifference" allegation, Plaintiffs are not conceding or alleging that deliberate indifference is a necessary element of a conditions of confinement claim. It is not. The County's and SHP's relevant policies, practices, and customs, whether written or not, were also objectively unreasonable as applied to the decedent.  There was also no legitimate governmental objective in those policies, practices, and customs.

119.    Therefore, the decedent's estate and his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery, through the estate administrator, from the County and SHP:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- the decedent's medical expenses; and

- the decedent's funeral expenses.

120.    Catherine McGehee, individually, and Milton Wilson Kaiser. Jr., individually and as estate administrator asserting claims on behalf of Wrongful Death Beneficiaries, also seek recovery from the County and SHP for all remedies and damages available to each

Wrongful Death Beneficiary individually for claims asserted in this pleading. Catherine McGehee and Milton Wilson Kaiser. Jr. are entitled to such damages due to the wrongful death of their son. The County's and SHP's policies, practices, and customs caused, were proximate causes of, producing causes of, and/or moving forces behind and caused the following damages suffered by these people, and which are legally available to each such category of person, for which each individually seeks compensation, whether as a party to this case or through another party asserting claims for such relief in some representative or other legally appropriate capacity:

- loss of household services, excluding any monetary payments made by decedent to a Wrongful Death Beneficiary;

- past mental anguish and emotional distress suffered by each resulting from and caused by the decedent's death;

- future mental anguish and emotional distress suffered by each resulting from and caused by the decedent's death; and

- loss of companionship and society, as applicable, that each would have received from the decedent.

Moreover, Plaintiffs seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

C.     Cause of Action Against DeWitt Medical District Pursuant to EMTALA

121.     In the alternative, without waiving any other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section(s) above) to the extent they are not inconsistent with the cause of action pled here, Defendant DeWitt Medical District is liable to Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs for violation of the Emergency Medical Treatment and Active Labor Act (EMTALA). DeWitt Medical District acted or failed to act at all relevant

times through its employees, agents, apparent or ostensible agents, borrowed servants, representatives, physicians, nurses, and/or other licensed and possibly non-licensed personnel and is vicariously liable for such actions and or failure to act to the extent allowed by law.

122.    A request for examination or treatment for a medical condition was made on behalf of the decedent to DeWitt Medical District, and DeWitt Medical District did not provide for an appropriate medical screening examination within the capability of the hospital's emergency department to determine whether the decedent had an emergency medical condition.    An "emergency medical condition" means a medical condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the health of the individual in serious jeopardy; or serious impairment to bodily functions; or serious dysfunction of any bodily organ or part. The decedent, Plaintiff, Wrongful Death Beneficiaries, and Claimant Heirs suffered personal harm as a direct result of an inappropriate discharge by the hospital before the hospital conducted an appropriate medical screening examination, and the decedent had an emergency medical condition. Material deterioration of the decedent's condition was likely, within reasonable medical probability, to result from or occur after discharge of decedent. The hospital's discharge of the decedent before the emergency medical condition was stabilized was inappropriate. Neither the decedent nor a legally responsible person acting on behalf of the decedent was informed of the hospital's obligations and of the risk of discharge, and the decedent did not request a discharge in writing or leave the hospital's facilities without the permission of any person employed by the hospital.

123.    This caused, was a producing cause of, and/or was a proximate cause of the

decedent's suffering, damages, and death, and all damages suffered by Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs and referenced in the pleading. Therefore, the decedent's estate and her heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery, through the estate administrator, from DeWitt Medical District:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- the decedent's medical expenses; and

- the decedent's funeral expenses.

124.    Catherine McGehee, individually, and Milton Wilson Kaiser. Jr., individually and as estate administrator asserting claims on behalf of Wrongful Death Beneficiaries, also seek recovery seek recovery from CHRISTUS Hospital Kleberg for all remedies and damages available to each Wrongful Death Beneficiary individually for these claims:

- Loss of household services suffered by each, excluding any monetary payments made by decedent to a Wrongful Death Beneficiary;
- past mental anguish and emotional distress suffered by each resulting from and caused by the decedent's death;
- future mental anguish and emotional distress suffered by each resulting from and caused by the decedent's death;  and
- loss of companionship and society that each would have received from the decedent.

D.    DeWitt Medical District Receives no Eleventh Amendment Protection

125.    DeWitt Medical District is not an arm of the State of Texas and is thus not entitled to Eleventh Amendment immunity from a suit for damages in federal court. Texas statutes and/or case law do not view DeWitt Medical District as an arm of the State of Texas.

Further, the source of DeWitt Medical District's funding is not such that it would be viewed as an arm of the State of Texas. DeWitt Medical District also has a significant degree of local autonomy. Further, it is concerned primarily with local as opposed to statewide problems. It further has the authority to sue and be sued in its own name, and it has the right to hold and use property.

126.    For example, DeWitt Medical District filed a lawsuit against Liberty Mutual Fire Insurance Company on March 19, 2025 in the 267th District Court of DeWitt County, Texas. DeWitt Medical District described the nature of the case as a first-party insurance case stemming from extensive damage to DeWitt Medical District's property from a wind and hail storm event in April 2023. The petition admitted that DeWitt Medical District was a hospital district with multiple buildings located in DeWitt County, Texas with several insured properties in the 2500 block of Esplanade. DeWitt Medical District sought damages for various causes of action, such damages including actual damages, consequential damages, and enhanced damages. DeWitt Medical District was thus suing in its own name to recover damages for property it owned.

127.    The statute creating DeWitt Medical District also supports DeWitt Medical District not being an arm of the State of Texas. Section 1035.006, entitled District Support and Maintenance Not State Obligation, reads, "The support and maintenance of the district's hospital system may not become a charge against or obligation of this state." Further, as opposed to being governed by the State of Texas, Section 1035.051 provides that there would be a board composed of five directors elected from the district at large. Each director, according to Section 1035.054, had to qualify by executing a good and sufficient bond that would be payable to the DeWitt Medical District as opposed to being payable to the State of

Texas. Directors also, pursuant to Section 1035.057, could be reimbursed for actual expenses incurred in the performance of their official duties, but only if the board of directors of DeWitt Medical District approved.

128.    Section 1035.059 provided for a district administrator. The district administrator would serve at the will of the DeWitt Medical District Board, as opposed to at the will of some state officer or agency. As with directors, the district administrator had to execute a bond that would be payable to the district. Further, the board of directors could pay for that bond with DeWitt Medical District Funds.

129.    Section 1035.601 provided for recruitment of medical staff and employees. The DeWitt Medical District board could spend district money to recruit physicians, nurses, or other trained medical personnel. The board could also pay the tuition or other costs or expenses of a medical or nursing student who was enrolled in good standing at an appropriate educational institution and contractually agreed to become a district employee in return for the assistance. The State of Texas was thus not participating in such compensation. Section 1035.063 also provided that the DeWitt Medical District board could contract with doctors or appoint doctors to the medical staff and could employ technicians, nurses, and other employees the board considers necessary for the efficient operation of the DeWitt Medical District.

130.    Section 1035.101 confirmed that the DeWitt Medical District was concerned with local issues. That provision reads that the district has full responsibility for providing medical and hospital care for the district's needy inhabitants. Section 1035.103 further affirms that the district is not subject to state control. That section reads in part that the board

of directors has all powers necessary, convenient, or incidental to carry out purposes for which the district was created. The board has complete management and control of all district business, which includes the power to negotiate and contract with any person, to purchase or lease land, to construct and equip a hospital system, to operate and maintain a hospital or hospitals, and to negotiate and contract with other political subdivisions or with private individuals, associations, or corporations for those purposes as the board of directors deems necessary or desirable.

131.    Section 1035.104 indicates that the DeWitt Medical District shall provide for establishment of a hospital or hospital system in its district by in part purchasing, constructing, acquiring, repairing, or renovating buildings and improvements for hospital purposes, and equipping the buildings and improvements for those purposes. Section 1035.106 even provides that the district itself may exercise the power of eminent domain to acquire interests in any type of property, including real, personal, or mixed, which is located in the district's territory. Section 1035.107 provides that the board of directors may accept for the district a gift or endowment.

132.    Section 1035.110 provides in part that the board of directors shall require the sheriff of DeWitt County or the police chief of any municipality in the district to reimburse the district for the district's care and treatment of a person who is confined in a jail facility of DeWitt County or the municipality, and who is not a district resident. It further provides that a prisoner in the DeWitt County jail, or in a penal or police facility located in the district, is not considered a district resident unless the person would meet the qualifications for residency notwithstanding the incarceration. That same section provides that the board of directors may contract with the state or federal government for that government to reimburse

the district for treatment of a sick or injured person. Section 1035.11, entitled Authority to Sue and Be Sued, provides that the district may sue and be sued in its own name in any court of Texas.

133.    Section 1035.152 provides that the district may annex one or more tracts of territory in accordance with the method provided by the relevant subchapter. Section 1035.201 provides that the board shall designate a bank in the county as the district's depository. Section 1035.202 provides that the district may borrow money and, to secure a loan, may pledge district revenue, district tax, or district bonds. Section 1035.251 provides that the board may issue and sell general obligation bonds authorized by an election in the name and on the faith and credit of the district itself. This may be done relating to the purchase, construction, acquisition, repair, or renovation of buildings or improvements, and equipping buildings or improvements for hospital purposes.   Therefore, DeWitt Medical District is not an arm of the State of Texas and is thus not entitled to Eleventh Amendment immunity from this suit for damages in federal court

IV.    Concluding Allegations and Prayer

A.    Conditions Precedent

134.    All conditions precedent to assertion of all claims herein have occurred.

B.    Use of Documents at Trial or Pretrial Proceedings

135.    Plaintiffs intend to use at one or more pretrial proceedings and at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

C.    Jury Demand

136.    Plaintiffs demand a jury trial on all issues which may be tried to a jury.

D.    Prayer

137.    Therefore, Plaintiffs ask that Defendants be summoned to appear and answer, and that Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs have judgment for damages within the jurisdictional limits of the court and against Defendants, jointly and severally, as legally applicable and available, for all damages referenced above and below in this pleading:

a)    actual damages and including but not necessarily limited to for:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- the decedent's medical expenses;

- the decedent's funeral expenses;

- loss of household services, excluding any monetary payments made by decedent to a Wrongful Death Beneficiary;

- past mental anguish and emotional distress suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death;

- future mental anguish and emotional distress suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death; and

- loss of companionship and/or society with the decedent suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death;

b)    reasonable and necessary attorneys' fees through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

c)    court costs and all other recoverable costs;

d)    prejudgment and postjudgment interest at the highest allowable rates; and

e)    all other relief, legal and equitable, general and special, to which Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs are entitled.

Respectfully submitted:

Law Offices of Dean Malone, P.C.

*/s/ T. Dean Malone*

T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Southern District of Texas Bar No. 37893
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone: (214) 670-9989
Telefax:  (214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
Southern District of Texas Bar No. 37991
michael.oconnor@deanmalone.com
Jennifer Kingaard
Texas State Bar No. 24048593
Southern District of Texas Bar No. 558276
jennifer.kingaard@gmail.com
Alexandra W. Payne
Texas State Bar No. 24118939
Southern District of Texas Bar No. 3799983
alexandra.payne@deanmalone.com
Jessica Bebawi
Texas State Bar No. 24108867
Southern District of Texas Bar No. 3886075
jessica.bebawi@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:        (214) 670-9904
Attorneys for Plaintiffs